WMCA, INC., R. Peter Straus, Joseph De Maio, Edward Lind, S. Thomas Delaney, Edward C. Brown, James J. McCafferty, Plaintiffs,

v.

John P. LOMENZO, Secretary of State of the State of New York, Louis J. Lefkowitz, Attorney General of the State of New York, Francis X. O'Rourke, Chairman, Board of Supervisors, Westchester County, and Arthur Cromarty, Chairman, Board of Supervisors, Suffolk County, Defendants,

and

Paul R. Screvane, President of the City Council of the City of New York, Eugene H. Nickerson, County Executive, Nassau County, Maurice J. O'Rourke, James Power, John R. Crews, Thomas Mallee, Commissioners, Board of Elections, New York City, Supporting Defendants,

and

John H. Hughes and Lawrence M. Rulison, Intervening Defendants.

United States District Court
S. D. New York.
Heard Jan. 21, 1965.
Order Filed Jan. 26, 1965.
Opinion Filed Feb. 1, 1965.
Resettled Order Filed Feb. 16, 1965.

918

---

Robinson, Silverman, Pearce, Aronsohn & Sand, New York City, for plaintiffs, Leonard Sand, and Max Gross, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, Orrin G. Judd, and Donald Zimmerman, New York City, of counsel.

Leo A. Larkin, Corp. Counsel of the City of New York, Morris Handel, George H. P. Dwight, and Joel Cohen, New York City, of counsel.

Jack Weinstein, Mineola, N. Y., for Eugene H. Nickerson, County Executive, Nassau County, Seymour S. Ross, Stephen Schlissel, and William D. Siegel, Mineola, N. Y., of counsel.

Gordon Miller, County Atty. of Westchester County, Irving Libenson, Deputy County Atty., Stephen G. Doig, Jr., County Atty. of Rockland County, Arnold Becker, Asst. County Atty., Mackenzie, Smith, Lewis, Mitchel & Hughes, Syracuse, N. Y., for John H. Hughes and Lawrence M. Rulison, Richard S. Scolaro, Syracuse, N. Y., of counsel.

Before WATERMAN, Circuit Judge, and RYAN and LEVET, District Judges.

WATERMAN, Circuit Judge:

Defendants Lomenzo, Lefkowitz, and Francis X. O'Rourke, and intervening defendants Hughes and Rulison, have moved for an order declaring that the New York State Reapportionment Compliance Act, N.Y. Laws 1964, ch. 976, 977, 978, 979, 981, complies with the order of this court dated July 27, 1964. Defendants Lomenzo and Lefkowitz have also moved for an order enjoining proceedings pending in the New York State Supreme Court to test the validity of the Act under Article III of the New York State Constitution. Plaintiffs, supported by defendants Screvane, Nickerson, Maurice J. O'Rourke, and Power, have moved for a contrary order declaring that the Act is in violation of Amendment XIV of the United States Constitution and of Article III of the New York State Constitution. They have also asked that we stay further proceedings in this court pending the outcome of the state court proceedings.

The history of this protracted suit has been fully set forth in WMCA v. Lomenzo, 377 U.S. 633, 635–641, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964), and need not be repeated here. In that decision, rendered June 15, 1964, the United States Supreme Court held that "New York's scheme of legislative apportionment," contained in Article III of the New York State Constitution, was in violation of the Equal Protection Clause of the United States Constitution. The Supreme Court interpreted the Equal Protection Clause to require "that seats in both houses of a bicameral state legislature must be apportioned substantially on a population basis," and it found that "New York's constitutional formulas relating to legislative apportionment demonstrably include a built-in bias against voters living in the State's more populous counties." Id. at 653–654, 84 S.Ct. at 1428.

The case was remanded to this court for further proceedings. Following a hearing, we issued our order, dated July 27, 1964, which decreed in part as follows:

"2. The scheme of legislative apportionment of the State of New York is hereby declared to be unconstitutional and void as being in conflict with the XIV Amendment of the Constitution of the United States;

"3. * * * [T]he 1964 election of Assemblymen and Senators shall be conducted as presently scheduled; provided that the terms of said

Members so elected on November 3, 1964, or at any special election to fill vacancies, shall expire on December 31, 1965, and providing further that not later than April 1, 1965, the Legislature shall have enacted into law a valid apportionment scheme that is in compliance with the XIV Amendment of the United States Constitution and which shall be implemented so as to effect the election of Members of the Legislature at the election in November, 1965, Members so elected to hold office for a term of one year ending December 31, 1966.

\* \* \* \* \* \*

"6. This Court retains jurisdiction of this case to conduct further proceedings as may be necessary."

On October 19, 1964, defendants Lomenzo and Lefkowitz (hereinafter called the State) filed a jurisdictional statement asking the Supreme Court to reverse our order insofar as it compelled legislative reapportionment by April 1, 1965 and an election pursuant thereto in November, 1965. Shortly thereafter, intervening defendants Hughes and Rulison (hereinafter called the State Senators) filed a similar jurisdictional statement. We have now been informed that the Supreme Court permitted the State to withdraw its appeal on January 22, 1965, but that the appeal by the State Senators is still pending. The subject matter of the appeal, however, is not at issue in the proceedings now before us for disposition; we are here concerned with matters as to which this court has retained jurisdiction.

Meanwhile, on July 12, 1964, in response to the decision of the Supreme Court, the Governor of the State of New York appointed a Citizens' Committee on Reapportionment to study basic reapportionment problems. As soon as the Citizens' Committee had submitted its report on December 1 (hereinafter cited Cit. Comm. Rep.), the Governor called a special session of the Legislature to meet on December 15 to act on reapportionment. By the time the Legislature convened, it also had before it the report of the Joint Legislative Committee on Reapportionment (hereinafter cited Jt. Leg. Comm. Rep.) proposing a reapportionment statute based in part on the recommendations of the Citizens' Committee. Pursuant to the proposals of the two committees, the Legislature enacted its Reapportionment Compliance Act on December 22 and 23, 1964, to take effect January 1, 1965.

The basic act, N. Y. Laws 1964, ch. 976 (hereinafter Plan A), is the most traditional of the four reapportionment schemes enacted but is the one least preferred by the Legislature. It creates and districts a Senate of 65 members and an Assembly of 165 members. The districts are apportioned on the basis of the 1960 citizen population, which is the 1960 federal census population minus aliens. Each member of both houses has one vote in the Legislature.

Three succeeding amendments to the basic act, N. Y. Laws 1964, ch. 977–78, 979, 981 (hereinafter Plans B, C and D), establish reapportionment schemes increasingly preferred by the Legislature but also increasingly novel. Plan B creates and districts a Senate of 65 members and an Assembly of 180 members. The districts are apportioned, not on the 1960 citizen population, but on the basis of the 1962 vote for Governor, including blank and void ballots. As under Plan A, each member of both houses has one vote.

Plan C creates and districts a Senate of 65 members, each with one vote, and an Assembly of 186 members, casting a total of 165 votes. 147 members of the Assembly have a full vote, and 39 members have fractions of a vote ranging from ¾ to ⅛ according to the population of their districts. As under Plan A, districts are apportioned on the basis of the 1960 citizen population.

Finally, Plan D creates and districts a Senate of 65 members, each with one vote, and an Assembly of 174 members, casting a total of 150 votes. As under

Plan C, 127 members of the Assembly have a full vote, and 47 members have fractions of a vote ranging from ¾ to ⅙. As under Plan B, districts are apportioned on the basis of the 1962 vote for Governor.

According to the report of the Joint Committee, Plan D is intended to be the law of New York State. However, if "[Plan D] were held to be invalid, [Plan C] would become operative. If [Plan C] were held to be invalid, [Plan B] would become operative. If [Plan B] were determined to be invalid, [Plan A], or so much thereof as a court of competent jurisdiction would determine to be valid, would become operative." Jt. Leg. Comm. Rep. 16.

Each plan provides that if the districts described therein contain minor descriptive errors, the Secretary of State shall correct the errors according to standards set forth in the Act (§ 403). Plans B, C, and D also state that if a court shall invalidate the system of fractional voting or the use of a voter population basis, it is the intent of the Legislature that the remainder of any plan incorporating these provisions shall also be invalid (§ 401).

On December 30, 1964, the State filed notice of a motion asking this court to declare that the Act complies with our order of July 27, 1964. The State Senators and defendant Francis X. O'Rourke subsequently supported the State's motion at a hearing before this court held on January 21, 1965. On December 31, 1964, defendant Nickerson (hereinafter called Nassau County) filed notice of a cross-motion, asking this court to declare that the Act violates the Constitutions of the United States and of New York State, and for appropriate relief. Similar notices were later filed by plaintiffs and by defendants Screvane, Maurice J. O'Rourke, and Power (hereinafter called New York City).

At the hearing on January 21, we were informed that on the previous day a Justice of the New York State Supreme Court had ordered state officials to show cause on January 29 why the Act should not be declared invalid under the New York State Constitution (Matter of Orans, No. 869/1965). In response to this development, the State moved in open court for an injunction against the state court proceedings, and New York City, supported by Nassau County and plaintiffs, asked us to stay proceedings in this court pending final determination of the proceedings in the state court.

At the close of the hearing, we reserved decision on all the motions in this case. In view of the pendency of the state court proceedings, however, we hastened to file our decree on January 26, with a promise that this opinion explaining our decree would soon follow. In brief, we denied the State's motion for an injunction, we denied New York City's motion for a stay, we declined to pass on claims that the Act is invalid under the New York State Constitution, we ruled that Plans B, C, and D are invalid under the United States Constitution, and we held that Plan A complies with our order of July 27, 1964.

### Claims under the New York State Constitution

Plaintiffs, supported by Nassau County and New York City, claim that the entire Reapportionment Compliance Act violates Article III, Sections 4 and 5 of the New York State Constitution in the following ways: the Act was not adopted at a regular session of the Legislature; the four plans contained in the Act amount to more than one reapportionment every ten years; the adoption of a series of plans to guard against judicial invalidation, and the provision for correction by an executive official, constitute a delegation of legislative power; the districts are not compact and contiguous and do not respect political boundaries. In addition, they claim that Plans B and D violate the sections of the State Constitution listed above in that they do not apportion on the basis of citizen population, and that Plans C and D violate Article III, Section 14 and other provisions of the State Constitu-

-tion, in that they depart from majority rule within the Legislature.[1]

The State contends that our order of July 27, 1964 invalidated all the provisions of Article III of the New York State Constitution which relate to legislative apportionment, thereby precluding the claims which have been recited. This contention misconstrues the scope of our order.

The order of July 27, 1964 was issued pursuant to the decisions of the United States Supreme Court in WMCA, Inc. v. Lomenzo, supra, and in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L. Ed.2d 506 (1964), to which the opinion in WMCA, Inc. v. Lomenzo referred. In Reynolds v. Sims, the Supreme Court wrote:

> "[S]tate constitutional provisions should be deemed violative of the Federal Constitution only when validly asserted constitutional rights could not otherwise be protected and effectuated. Clearly, courts should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible." Id. at 584, 84 S.Ct. at 1393.

Specifically, the Supreme Court ruled:

> "A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme * * *, [so long as] the vote of any citizen is approximately equal in weight to that of any other citizen in the State." Id. at 578–579, 84 S.Ct. at 1390.

Similarly, the Supreme Court held:

> "While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably

current scheme of legislative representation." Id. at 583–584, 84 S. Ct. at 1393.

Moreover, for the reasons stated below, we believe that the Supreme Court approved the use of citizen population as a basis for legislative apportionment.

Accordingly, in invalidating "New York's scheme of legislative apportionment," the Supreme Court pointed only to "the state constitutional formulas" by which "the weight of the votes of those living in populous areas is of necessity substantially diluted in effect." WMCA, Inc. v. Lomenzo, supra, at 653, 84 S.Ct. at 1428. Our order of July 27, 1964, declaring void "the scheme of legislative apportionment of the State of New York," was deliberately designed to hew as closely as possible, both in wording and connotation, to the decision of the Supreme Court. Even the remedy prescribed in our order involved no conflict with those provisions of the New York State Constitution pleaded by plaintiffs. We decreed that reapportionment should be done by the Legislature; we required the enactment of but one valid scheme; and we gave the Legislature sufficient time to reapportion during a regular session.

In short, as far as the Federal Constitution is concerned, all the provisions of Article III of the State Constitution relied on by plaintiffs are still operative. Moreover, these provisions are limited in their application only to the extent that they are in unavoidable conflict with the decision of the Supreme Court in WMCA, Inc. v. Lomenzo, supra, or with the July 27, 1964 order of this court. If, as the State suggests, these provisions of Article III are inseparably intertwined with the "constitutional formulas" condemned by the Supreme Court, so that all must fall together, this would be a consequence of state law rather than federal law.

However, this court declines to pass on plaintiffs' claims that the Re-

---

1. Plaintiffs make no claim that the Act violates the State Constitution because it enlarges the size of both houses of the Legislature.

apportionment Compliance Act is invalid under the New York State Constitution. Together with the issue of inseparability, these claims raise difficult problems of state law interpretation; our examination of the briefs of the parties and the cases cited therein makes this fact amply clear. Moreover, we are here concerned with a matter of the utmost sensitivity and importance to the people of the State of New York. Finally, there is presently pending a proceeding in the New York State courts, in which those attacking the validity of the Reapportionment Compliance Act can obtain an expeditious hearing on their claims under state law. N.Y.Const. Art. III, § 5. This is clearly an appropriate case for abstention by the federal courts. See 1A Moore, Federal Practice ¶ 0.203 (1961). Our discussion above of the continued viability of Article III of the New York State Constitution is therefore meant only as a guide to the New York State courts and not as groundwork for a determination of our own of plaintiffs' claims under state law.

What has already been said provides a sufficient answer to the State's request that we enjoin the proceedings pending in the state courts. Since we are not passing on claims under the State Constitution, and since the proceedings begun in the state courts do not raise claims under the Federal Constitution, there is no possibility here of conflicting adjudications. Neither our jurisdiction nor our judgments are jeopardized, within the meaning of 28 U.S.C. § 2283. See 1A Moore, Federal Practice ¶¶ 0.224, 0.225 (1961). Therefore, the motion for an injunction against the proceedings in the state courts is denied.

Likewise, New York City's motion for a stay of the proceedings in this court, pending the outcome of the proceedings in the state court, is denied. In Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1453, 12 L.Ed.2d 609, a companion case to Reynolds v. Sims, supra, and WMCA, Inc. v. Lomenzo, supra, testing the validity of Virginia's legislative apportionment under the Federal Constitution, the federal district court refused to stay the federal court action on the claimed ground that "plaintiffs should be required first to procure the views of the state courts on the validity of the apportionment scheme." Id. at 683, 84 S.Ct. at 1443. The Supreme Court approved this determination in the following words:

"Where a federal court's jurisdiction is properly invoked, and the relevant state constitutional and statutory provisions are plain and unambiguous, there is no necessity for the federal court to abstain pending determination of the state law questions in a state court. McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622. This is especially so where, as here, no state proceeding had been instituted or was pending when the District Court's jurisdiction was invoked." Id. at 690–691, 84 S.Ct. at 1447–1448.

This ruling fits our case. There is no dispute between the parties over the meaning of those provisions of the Reapportionment Compliance Act which have been challenged by plaintiffs under the Federal Constitution, and there was no state court proceeding pending when our jurisdiction was invoked on December 30, 1964. Nor can our case be distinguished from Davis v. Mann on the ground that here a state proceeding was instituted before the proceedings in this court were ready for judgment, or that here it is those challenging the state apportionment scheme who are seeking the stay. We have ordered the Legislature to reapportion itself validly by April 1, 1965, and the Legislature has attemped to obey our order. The State is entitled to know as soon as possible whether our order has been satisfied by what the Legislature has done.

### Claims under the United States Constitution

Nassau County contends that the adoption of a series of reapportionment plans, and the invitation to this court to choose among them, is an abuse of our order

directing the Legislature to enact "a valid apportionment scheme."

The Joint Committee explained its novel response to our order as follows:

"[I]t remains impossible to predict with certainty how the [Supreme] Court will resolve all the questions it intentionally left unanswered in this area.

 \* \* \* \* \* \*

"The Federal District Court's order of July 27, 1964 specifically requires that 'not later than April 1, 1965, the Legislature shall have enacted into law a valid apportionment scheme.'

 \* \* \* \* \* \*

"There is absolute necessity for stability and certainty in the legislative process, and the assurance that the acts of the Legislature will not remain subject to continuing challenge.

 \* \* \* \* \* \*

"Accordingly, we would be derelict in our duty if we recommended to your Honorable Bodies that complete reliance be placed in a single apportionment and districting plan which may or may not withstand constitutional attack." Jt.Leg.Comm.Rep. 15–16.

■■ We find the Joint Committee's explanation persuasive. Under the unique circumstances of this case, it was not an abuse of our order for the Legislature to enact four alternative apportionment plans rather than only one. At worst, insofar as the Legislature's response to our order manifests its doubts about the validity of the plans which have been enacted, the presumption of constitutionality ordinarily accorded to legislation is weakened to some extent. See WMCA, Inc. v. Simon, 208 F.Supp. 368, 373 (SDNY 1962).

Plaintiffs, supported by Nassau County, claim that Plans D and C, which employ fractional voting in the Assembly, violate the requirement of the Equal Protection Clause that "seats in both houses of a bicameral state legislature must be apportioned substantially on a population basis." WMCA, Inc. v. Lomenzo, supra, 377 U.S. at 653, 84 S.Ct. at 1428.

According to the Citizens' Committee and the Joint Committee, the main purpose of fractional voting is to assure that every county in the state, except Fulton and Hamilton, will have at least one Assemblyman all of its own, without the Assembly's being enlarged to over 1000 members. Cit.Comm.Rep. 29–31, 39–40; Jt.Leg.Comm.Rep. 9–13. This policy was endorsed by the Supreme Court in Reynolds v. Sims, supra, 377 U.S. at 580, 84 S.Ct. at 1391: "[A] State can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained."

If voting were the only important function of a legislator, the scheme of fractional voting in Plans D and C would probably not offend "the basic standard of equality" among districts. But legislators have numerous important functions that have nothing directly to do with voting: participation in the work of legislative committees and party caucuses, debating on the floor of the legislature, discussing measures with other legislators and executive agencies, and the like. The Assemblyman who represents only one-sixth of a district can theoretically give each constituent six times as much representation in these respects as the Assemblyman who represents a full district. This disparity of representation persists even if the State is right in arguing that the Assemblyman with only one-sixth of a vote will carry only one-sixth as much political weight when he engages in these activities.

Moreover, fractional districts are enjoyed mainly by the sparsely populated areas of the state. Of the forty-seven Assemblymen who would cast fractional votes under Plan D, thirty-seven are from counties too thinly inhabited to have any additional representation in the Assem-

bly. Of the thirty-nine Assemblymen who would cast fractional votes under Plan C, thirty-four are from counties too thinly inhabited to have any additional representation in the Assembly. None of the Assemblymen with fractional votes under either plan are from New York City or Nassau County. In view of the Supreme Court's concern for New York's traditional "bias against voters living in the State's more populous counties," WMCA, Inc. v. Lomenzo, supra, 377 U. S. at 654, 84 S.Ct. at 1428, this imbalance makes fractional voting particularly vulnerable.

The State argues that fractional districts are actually disadvantageous to the people living in them. Its theory is that lobbyists will tend to woo only those legislators with full votes, since more effort is involved in convincing a series of legislators who share one vote. If this be true, it only demonstrates that in some respects fractional voting entails counter-discrimination. It does not prove that fractional voting is entirely free of discrimination.

■ Accordingly, we hold that Plans D and C violate the XIV Amendment of the United States Constitution and therefore do not comply with the July 27, 1964 order of this court. No doubt is cast on this conclusion by the statement in Reynolds v. Sims, supra, 377 U.S. at 579, 84 S.Ct. at 1390, that a state "might [legitimately] desire to achieve some flexibility by creating multimember or floterial districts," or by the recent Supreme Court ruling in Fortson v. Dorsey, 85 S.Ct. 498 (1965), upholding Georgia's partial use of multimember districts. Unlike a fractional district, the extraordinary population of a multimember district is balanced in all respects by its extra-ordinary number of representatives.[2]

■ Plaintiffs claim that Plan B violates the XIV Amendment of the United States Constitution by using as a base

for legislative apportionment the 1962 vote for Governor rather than the citizen population of the state, and therefore that the scheme does not comply with the July 27, 1964 order of this court. Under the circumstances of this particular case, and limiting ourselves thereto, we agree with plaintiffs.

Since 1894, New York has districted its Legislature by using as an apportionment base the state's citizen population. Now, for the first time in seventy years, the very same body which has been held by the Supreme Court to be malapportioned would switch its apportionment base from citizen population to actual voters. The effect of this switch would be to reduce New York City's share of the total apportionment base from 45.7% to 41.9%. In terms of representation in the Legislature under Plan B, New York City would thereby lose approximately 2½ Senate seats and nearly 7 Assembly seats. Again, in view of the Supreme Court's concern for New York's pre-existing "bias against voters living in the State's more populous counties," WMCA, Inc. v. Lomenzo, supra, 377 U. S. at 654, 84 S.Ct. at 1428, we cannot condone this ghost of prior malapportionment.

It might be otherwise if the Legislature had acted under the impression that a voter base was required by the United States Constitution, but this was not the case. The Citizens' Committee reported that the continued use of the citizen base for legislative apportionment "would raise few, if any, legal problems" under the Federal Constitution. Cit.Comm. Rep. 12. The Joint Committee apparently agreed, for it based its ultimate statutory backstop, Plan A, on citizen population. We do not mean to suggest that there may not be sound policy reasons for changing the state's base for legislative apportionment from citizen population to actual voters. See Cit.Comm.Rep. 14–15; Jt.Leg.Comm.Rep. 7–8. We say only

2. We express no opinion on the use of fractional or weighted voting either as a temporary device to remedy malapportionment or in governmental organs below the state level.

that under the particular circumstances within which this change actually occurred, these policy reasons are not sufficient to dispel the inference of discrimination against city-dwellers.[3]

Nassau County claims that Plan A, by basing apportionment on citizens rather than on residents, violates the requirement of the Equal Protection Clause that "seats in both houses of a bicameral state legislature must be apportioned substantially on a population basis." WMCA, Inc. v. Lomenzo, supra, 377 U.S. at 653, 84 S.Ct. at 1428.

■■ It is true that in its series of decisions on June 15, 1964, the Supreme Court repeatedly stated its fundamental holding in terms of equality of "population." But a crucial passage in Reynolds v. Sims, supra, 377 U.S. at 577, 84 S.Ct. at 1389, convinces us that "population" may mean the total number of citizens as well as the total number of residents. The Supreme Court stated:

> "[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable. We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of *residents, or citizens, or voters*. Mathematical exactness or precision is hardly a workable constitutional requirement." (Emphasis supplied).

The opinion in WMCA, Inc. v. Lomenzo, supra, confirms this interpretation. The Supreme Court recited the provisions of Article III of the New York State Constitution requiring apportionment of the Senate and the Assembly on the basis of citizen population, id., 377 U.S. at 642, 646, 84 S.Ct. 1418; the Court expressly noted the fact that "New York uses citizen population instead of total population, excluding aliens from consideration, for purposes of legislative apportionment," id. at 641, 84 S.Ct. at 1422; and in demonstrating the arithmetical inequities of the state's scheme of legislative apportionment, the Court based its calculations on citizen populations, id. at 647–651, 84 S.Ct. 1418. Nowhere in the opinion, however, did the Supreme Court even intimate that New York's use of a citizen population base for purposes of legislative apportionment contributed in any way to the unconstitutionality of the state's scheme.

It should also be noted that a change from the citizen base to a resident base for legislative apportionment would have but little impact on the densely populated areas of New York State. New York City's share of the total apportionment base would rise only from 45.7% to 46.4%, and Nassau County's share would actually drop from 7.9% to 7.7%. In terms of representation in the Legislature under Plan A, New York City would thereby gain less than one-half of a Senate seat and only a little more than one Assembly seat. It would appear that New York's use of its traditional citizen population base, rather than a novel resident population base, affects all areas of the state substantially equally.

Plaintiffs, supported by Nassau County and New York City, claim with great vehemence that Plan A violates the XIV Amendment of the United States Constitution, because it allegedly gerrymanders the state for partisan political advantage.

At the start of the hearing on January 21, 1965, we ruled that these attacks "do not raise questions under the Federal Constitution, and consequently we request of you that you devote none of your time in addressing us with reference thereto" (S.M. 10–11). At the same time, upon objections by the State, we denied petitions to intervene by Noel

---

3. We express no opinion on the validity of a voter basis under other circumstances. See Reynolds v. Sims, supra, at 577, 84 S.Ct. at 1390, quoted infra, at p. 925.

Austin, by the Village Independent Democrats and four of their members, and by the City of Rochester, in part on the ground that they raised issues relating only to political gerrymandering. An amplification of our ruling is here in order.

As we pointed out at the hearing:

"We have noted the descriptions and have examined the maps that have been made available to us showing the perimeters of the senatorial and assembly districts adopted by the State Legislature last month, and we do not find that in comparing the inhabitants, citizens or voters in any districts with those of any other districts there has been any invidious discrimination relative to any person's race, color, creed, national origin or sex; and none such has been alleged in any of the petitions brought before us for declaratory judgment today and none has been filed by any of the present parties in this cause." (S.M. 9–10).

 Consequently, this case is not governed by Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), in which the Supreme Court held that redrawing the boundaries of a city in order to exclude Negro voters constitutes a violation of the XV Amendment of the Federal Constitution. Even if voters, merely shifted from one legislative district to another, can be said to have had their right to vote "denied or abridged," within the meaning of that constitutional provision, the gerrymandering alleged here was not based on "race, color, or previous condition of servitude."

Nor is this case influenced by Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), in which the Supreme Court may have intimated that drawing legislative districts in order to separate native-born whites from Negroes and Puerto Ricans constitutes a violation of the XIV Amendment of the Federal Constitution. As the dissenters pointed out, state-sponsored segregation based on race, religion, or ancestry is peculiarly vulnerable to constitutional attack. Id. at 61–62, 68–69, 84 S.Ct. 603. The integration of Democrats and Republicans, or of Liberals and Conservatives, has no such privileged status under the Federal Constitution.

At the hearing we went on to say:

"Under the provisions of the Fourteenth Amendment of the United States Constitution [as expounded in Reynolds v. Sims] this Court, with reference to the shape, size or population density of a district, is only required to ascertain whether a vote for assemblyman or senator in one district is debased or diluted in relation to a vote for assemblyman or a senator in another district, and to ascertain whether these districts are so constructed as to contain within them as nearly equal populations as is practicable." (S.M. 10).

In short, Reynolds v. Sims concerned arithmetic and not geometry.

Since plaintiffs have neither argued nor proved that the alleged political gerrymandering has produced districts of unequal populations, this suit does not come within the purview of Reynolds v. Sims. It is true that the opinion in that case treated partisan gerrymandering as an evil which a state may legitimately seek to preclude. Id. at 578–579, 581, 84 S.Ct. 1362. But Fortson v. Dorsey, supra, 85 S.Ct. at 501, makes it clear that the Supreme Court has refrained from condemning partisan gerrymandering as unconstitutional.

Plaintiffs make no claim that Plan A creates legislative districts not substantially equal in citizen population and that it thereby violates the XIV Amendment of the United States Constitution. However, in view of the Supreme Court's ruling in WMCA Inc. v. Lomenzo, supra, 377 U.S. at 653, 84 S.Ct. at 1428, that "seats in both houses of a bicameral state legislature must be apportioned substantially on a population basis," we think it advisable to satisfy ourselves that the Legislature has complied with

the Equal Protection Clause in this respect.

In its series of decisions on June 15, 1964, the Supreme Court repeatedly tested equality of legislative apportionment by calculating the population ratio of the largest and smallest districts in the state and by determining the minimum percentage of persons in the state represented by a majority of the legislature. A perfectly apportioned legislature would show a population ratio of 1:1 and a minimum percentage of 50.1%. Of the legislative apportionment schemes condemned by the Supreme Court, Virginia's came closest to perfect equality, with population ratios between the largest and smallest districts of 2.65:1 in the Senate and 4.36:1 in the House, and with minimum percentages of persons represented by a legislative majority of 41.1% in the Senate and 40.5% in the House. Davis v. Mann, supra, 377 U.S. at 687–689, 84 S.Ct. at 1458. On the other hand, the Supreme Court indicated that Colorado's House, with a population ratio of 1.7:1 and a minimum percentage of 45.1%, was "at least arguably apportioned substantially on a population basis * * *." Lucas v. Colorado Gen. Assembly, 377 U.S. 713, 727, 730, 84 S.Ct. 1459, 1476, 12 L.Ed.2d 632 (1964).

Under Plan A, the ratio of citizen populations between the largest and smallest districts in New York is 1.15:1 in the Senate and 1.21:1 in the Assembly, while the minimum percentage of citizens represented by a majority of the New York Legislature is 49.4% for the Senate and 49.3% for the Assembly. These minor deviations from perfect equality are clearly permissible under the Federal Constitution. "Mathematical exactness or precision is hardly a workable constitutional requirement." Reynolds v. Sims, supra, 377 U.S. at 577, 84 S.Ct. at 1390.

Testing Plan A for "bias against voters living in the State's more populous counties," WMCA, Inc. v. Lomenzo, supra, 377 U.S. at 654, 84 S.Ct. at 1428, we reach the same result. In a perfectly apportioned scheme, New York City would have 29.7 out of 65 seats in the Senate and 75.4 out of 165 seats in the Assembly. Under Plan A, New York City actually receives 30 seats in the Senate and 75 seats in the Assembly, and it shares one additional seat in each house with neighboring counties. Likewise, Nassau County is mathematically entitled to 5.1 seats in the Senate and 13.0 seats in the Assembly. It actually fills 4 seats in the Senate and 12 seats in the Assembly, and it shares two additional seats in each house with neighboring counties.

Accordingly, we hold that Plan A complies with the XIV Amendment of the United States Constitution and with our order of July 27, 1964. Of course, the ultimate fitness of the scheme for their needs and purposes is for the people of the State of New York, themselves, to decide, and not for this court to mandate.

We append here our decree filed January 26, 1965.

## APPENDIX

Upon all the motion papers, papers in opposition thereto, and proceedings in open court on January 21, 1965, it is ordered:

1. Article III of the New York State Constitution is invalid under Amendment XIV of the United States Constitution only to the extent that its provisions are in unavoidable conflict with the decision of the United States Supreme Court in WMCA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964) and with the order of this court dated July 27, 1964.

2. This court has not passed upon claims that the Reapportionment Compliance Act is invalid under Article III of the New York State Constitution because of its contents or the manner in which it was enacted.

3. The motion requesting an injunction against pending proceedings in the New York State courts, testing the validity of the Reapportionment Compliance Act under Article III of the New York State Constitution, is denied.

4. The motion requesting a stay of the proceedings in this court, pending the outcome of the proceedings in the New York State courts, is denied.

5. The Reapportionment Compliance Act, as amended by Chapter 981 of the Laws of 1964, does not comply with the order of this court dated July 27, 1964, because it is in conflict with Amendment XIV of the United States Constitution.

6. The Reapportionment Compliance Act, as amended by Chapter 979 of the Laws of 1964, does not comply with the order of this court dated July 27, 1964, because it is in conflict with Amendment XIV of the United States Constitution.

7. The Reapportionment Compliance Act, as amended by Chapters 977 and 978 of the Laws of 1964, does not comply with the order of this court dated July 27, 1964, because it is in conflict with Amendment XIV of the United States Constitution.

8. The Reapportionment Compliance Act, Chapter 976 of the Laws of 1964, complies with the order of this court dated July 27, 1964.

9. Plaintiffs' application for further injunctive relief is denied except that the defendants are enjoined from taking any steps or proceedings to effectuate the provisions of the Reapportionment Compliance Act as amended either by Chapter 981, Chapter 979 or Chapters 977 and 978 of the Laws of 1964. (Inserted after notice and hearing on February 16, 1965).

10. Jurisdiction of further proceedings which may be found to be necessary in this court is retained.

An explanatory opinion will follow shortly.