Nelson G. GRILLS, Plaintiff,

Dorothy C. Duddleston, John P. Gallagher, Miles H. Marshall and Louis Y. Mundy, Intervening Plaintiffs,

v.

Roger D. BRANIGIN, Edwin M. S. Steers, James E. Noland, As Members of the State Election Board of Indiana, Defendants.

No. IP 64–C–101.

United States District Court
S. D. Indiana,
Indianapolis Division.

Feb. 17, 1966.

Nelson G. Grillls, Indianapolis, Ind., for plaintiff.

Buena Chaney, of Mann, Mann, Chaney, Johnson & Hicks, Terre Haute, Ind., for intervening plaintiffs.

John J. Dillon, Atty. Gen., of Indiana, for defendants.

Before KNOCH, Circuit Judge, and DILLIN and HOLDER, District Judges.

PER CURIAM.

On March 2, 1964, the plaintiff Nelson G. Grills filed his action against the persons then constituting the Indiana State Election Board, in their official capacity as such, seeking to enjoin them from con-

ducting an election in the State of Indiana in 1964 or thereafter for representative in Congress from any of the eleven congressional districts of Indiana, as those districts were apportioned by Chapter 174 of the Acts of the General Assembly of 1941. He charged that the districts established by such Act do not apportion among the citizens of Indiana the members of the House of Representatives in accordance with Article 1, Section 2 of the Constitution of the United States, that he and other citizens of Marion County, Indiana (comprising the Eleventh, and most overpopulated District) were thus deprived of various rights guaranteed to them by the Fourteenth Amendment to such Constitution, and sought a declaratory judgment to this effect.

Jurisdiction of the action was found to exist, and a three judge court convened. 28 U.S.C. §§ 1343(3), 2284. However, the Court, having found, *inter alia*, that the political calendar dictated by the Indiana Election Code was already in operation for the 1964 general election when the action was commenced, and that there was no prospect of a session of the Indiana General Assembly until after such election, elected to abstain from proceeding with the cause until a reasonable time after commencement of the 94th Indiana General Assembly. The 94th General Assembly convened in due course and enacted a new districting act, Chapter 205 of the Acts of 1965, which realigned all eleven congressional districts and repealed all laws in conflict. It became effective March 9, 1965.

Thereafter, on January 10, 1966, Dorothy C. Duddleston, John P. Gallagher, Miles H. Marshall, and Louis Y. Mundy, respectively citizens of the newly constituted Seventh, First, Tenth, and Sixth Congressional Districts, were permitted to intervene as parties plaintiff for the purpose of seeking injunctive relief against the members of the State Election Board and a declaration of unconstitutionality as to the 1965 Act upon similar grounds as alleged by Grills with respect to the 1941 Act. Such intervening plaintiffs asserted as further grounds for relief that the 1965 Act established districts which were not compact, contiguous, equal and cohesive, disregarded natural or historical boundary lines, and gerrymandered the districts along political lines.

Roger D. Branigin was substituted for Matthew E. Welsh as a party defendant, the former having in January, 1965 succeeded the latter as a member of the State Election Board, and the cause was summarily ordered put at issue and advanced on the trial calendar because of the public importance of the questions involved. Evidence was heard and concluded on January 31, 1966.

We first consider the separate complaints of the intervening plaintiffs other than those relating to the inequality of population as between the newly constituted districts. As to the allegation that the districts, or some of them, contain territory which is not contiguous to other territory within the district, we find as a fact that plaintiffs have failed to sustain their burden of proof with respect thereto. Other allegations are that the districts are not compact, not cohesive, disregard natural or historical boundary lines, and are politically gerrymandered to make them "safe" for candidates of one or another of the major political parties. None of these elements result in invidious discrimination, relative to any person's race, color, creed, national origin or sex, and do not state a federal question. Wood v. Broom, 287 U.S. 1, 6–7, 53 S.Ct. 1, 77 L.Ed. 131 (1932); Wesberry v. Sanders, 376 U.S. 1, 7–8, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); Lucas v. 44th Gen. Assembly of the State of Colorado, 377 U.S. 713, 738, 84 S.Ct. 1459, 1472, 12 L.Ed.2d 632 (1964); WMCA, Inc. v. Lomenzo, D.C., S.D.N.Y., 1965, 238 F.Supp. 916, 926, affd. 382 U.S. 4, 86 S.Ct. 24, 15 L.Ed. 2d 2.

We finally arrive at the only justiciable issues raised by the original and intervening plaintiffs, which are whether either the 1941 Act or the 1965 Act, or both, are unconstitutional by reason of

population variances between the congressional districts therein constituted. The law, of course, is that Article 1, § 2 of the Constitution is to be interpreted as meaning that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." Wesberry v. Sanders, supra.

The difficulty lies in interpreting what is "as nearly as is practicable," for the Supreme Court has not only thus far declined to furnish a definitive yardstick but has observed that "it may not be possible to draw congressional districts with mathematical precision," *Wesberry.* And with regard to the similar problem of legislative apportionment it has warned against any "attempt to state in mathematical language the constitutionally permissible bounds of discretion in deviating from apportionment according to population," adding: "In our view the problem does not lend itself to any such uniform formula, and it is neither practicable nor desirable to establish rigid mathematical standards * * *." Roman v. Sincock, 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964). It has also said that "[w]hat is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case." Reynolds v. Sims, 377 U.S. 533, 578, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964).

We take judicial notice of the startling results seen in the 1960 decennial census report due to the explosion and shift of population.

For example, a district's population has more than doubled between 1950 and 1960. Such a district which may be an ideal district in population in contrast to other districts in a given state, at the time of the census, may create a condition before the first post-congressional election takes place whereby the voter in such district may have by far a smaller weighted vote than that enjoyed in another congressional district in the same state. Such an event would produce greater abnormal tolerances than exist in the case which we now have under consideration.

Then, too, where a congressional district has doubled in population, a voter's weighted vote will be at least one-half that of a vote in other congressional districts in the same state. The only corrective method to keep that district comparatively even with the other districts in the state would be to take a new census every two years and promptly reapportion.

We find from the relevant statutes and the 1960 Federal census, of which we take judicial notice, that the populations of the eleven Indiana congressional districts as constituted both by the 1941 and the 1965 Acts are as set out in the table attached to and forming a part of this opinion, which table also shows deviations above and below the ideal population of a district (423,863) in terms both of percentage and of people.

From such table it will be noted that under the 1941 Act, the districts varied in population from 290,596 to 697,567; thus the ratio of the largest to the smallest district in terms of population was 2.4 to 1. The six smaller districts had a combined population of 2,095,302, out of the State's total population of 4,662,498, so that 44.9% of the population elected a majority of the congressional delegation of the State. Finally, the population fluctuations ranged from an underpopulation of 31.5% to an overpopulation of 64.6%, for a total variance from the least to the highest populated district of 96.1%. Six of the eleven districts varied from the ideal population figure by more than 15%.

The 1941 Act is clearly unconstitutional by all previously announced judicial standards, cf. Wesberry v. Sanders, supra; Martin v. Bush, 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656 (1964); Moore v. Moore (D.C.Ala., 1964) 229 F.Supp. 435; Meeks v. Anderson (D.C.Kan., 1964) 229 F.Supp. 271; Maryland Citizens Committee, etc. v. Tawes, (D.C. Md., 1964) 228 F.Supp. 956. It has been suggested that this issue became moot with the passage of the 1965 Act, but we deem it advisable to specifically hold the 1941 Act to be unconstitutional, as we

did at the outset of the trial (all parties being in agreement on the matter), in order to eliminate any possibility of its revival in the event of the 1965 Act being subsequently held to be invalid for any reason.

Under the 1965 Act we find that the extreme variations in population are from 369,663 to 454,208, a ratio of 1.2 to 1. The six smaller districts have a combined population of 2,442,067, so that a majority of the entire congressional delegation is now elected by a true majority of 52.5% of the total population. (Ideally the percentage would be 54.5%, the decimal equivalent of the fraction 6/11.) Individual district fluctuations are from an under population of 12.8% to an over-population of 7.2%, for a total variance from the least to the highest populated district of exactly 20.0%. None of the districts varies from the ideal population figure by as much as 15%, and only one by more than 10%.

Although, as above noted, the Supreme Court has thus far refused to countenance evaluation of constitutionality in terms of mathematical absolutes, it is inevitable that such standards have been seriously proposed by members of the judiciary and of the Congress, political scientists, and others. Such opinions, while not binding upon us, are at least entitled to be noted. One view, in existence long before *Wesberry*, was that no district should contain fewer than 85% of the population average nor more than 115%.[1] This formula is contained in a bill presently pending before the Congress.[2] Another widely discussed view is that the sum of the highest and lowest variations from average population, expressed as a percent, should not exceed 20%. Still another is to consider the ratio of variance between the districts having the highest and lowest popula-

tions. A ratio of 1.5 was disapproved in Roman v. Sincock, supra, but ratios of 1.3, existing in Massachusetts, Minnesota, Iowa, and New York, have not been challenged.[3] Colorado's 1964 revision, resulting in a ratio of 1.2, has likewise not been challenged.[4] The New Hampshire districts have been reapportioned, and the resulting ratio of 1.2 upheld by the State Supreme Court. Levitt v. Maynard (1964) 105 N.H. 447, 202 A.2d 478.

It will be observed that the redistricting of the Indiana congressional districts, as contained in Chapter 205 of the Acts of 1965 meets various suggested tests in that: the ratio between the largest and smallest districts is 1.2, no district varies from average by as much as 15%, the total variation between the largest and smallest district does not exceed 20%, and it requires a majority of the total population to elect a majority of the Indiana delegation to the House of Representatives in Congress. No matter what reapportionment bill may be passed, it is safe to say that there is always room for improvement. The trend must be towards the ideal proportions.

■ We have considered the action of the 94th General Assembly of Indiana in enacting the 1965 Act in the light of the fact that more definite guide lines have not been provided by either the Courts or Congress, and the further fact that there are only four districts varying more than 6% from the ideal, as follows:

| District | % Variation |
| --- | --- |
| 1 | + 7.2 |
| 4 | + 6.4 |
| 7 | −12.8 |
| 3 | − 9.7 |

We find the Act constitutional, within the provisions of Article 1, § 2 of the

1. "The Reapportionment of Congress," 45 American Political Science Review 153 (1951).

2. H.B. 5505, introduced by Representative Celler, contains the ± 15% formula; it passed the House of Representatives at the first session of the 89th Congress, and now awaits action by the Senate.

3. "Congressional Districting and the Wesberry Case," The Library of Congress Reference Service (1965).

4. Id.

Constitution, as interpreted by Wesberry v. Sanders, supra.

In so holding we are not unmindful of the likelihood of further judicial direction and improvements by way of subsequent legislative enactments. It is strongly suggested that the members of the 95th General Assembly of Indiana, which will be created by elections under the 1965 legislative apportionment Act, take action to eliminate any abnormalities in the 1965 congressional reapportionment Act in order that Indiana may have not merely a legal Act but a model Act. Such action of the General Assembly, of course, should take into consideration any new guide lines laid down by decisions of the courts or by congressional enactment.

### Table of Indiana Congressional Districts

| District | Population | | Variance in Population | | Variance in percentage of Population | |
|---|---|---|---|---|---|---|
| | 1941 Act | 1965 Act | 1941 Act | 1965 Act | 1941 Act | 1965 Act |
| 1 | 513,269 | 454,208 | + 89,406 | + 30,345 | +21.1 | + 7.2 |
| 2 | 357,309 | 431,064 | − 66,554 | + 7,201 | −15.9 | + 1.7 |
| 3 | 472,958 | 384,079 | + 49,095 | − 39,784 | +11.1 | − 9.7 |
| 4 | 390,010 | 450,937 | − 33,853 | + 27,074 | − 8.0 | + 6.4 |
| 5 | 459,473 | 426,110 | + 35,610 | + 2,247 | + 8.4 | + 0.5 |
| 6 | 333,783 | 438,961 | − 90,080 | + 15,098 | −21.0 | + 3.6 |
| 7 | 329,213 | 369,663 | − 94,650 | − 54,200 | −22.4 | −12.8 |
| 8 | 423,929 | 443,252 | + 66 | + 19,389 | 0.0 | + 4.6 |
| 9 | 290,596 | 424,933 | −143,267 | + 1,070 | −31.5 | + 0.3 |
| 10 | 394,391 | 406,218 | − 29,472 | − 17,645 | − 7.0 | − 4.2 |
| 11 | 697,567 | 433,073 | +273,704 | + 9,210 | +64.6 | + 2.2 |
| | 4,662,498 | 4,662,498 | | | | |

Average District: 423,863

HOLDER, District Judge (dissenting).

The action was commenced March 2, 1964. Mr. Grills' action contested the congressional apportionment in Indiana as created by Chapter 174 of the 1941 Acts of the Indiana General Assembly. The Supreme Court had just spoken in the congressional districting case of Wesberry et al. v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481, which had been decided February 17, 1964. It was decided:

" * * * that the constitutional test for the validity of congressional districting schemes was one of substantial equality of population among the various districts established by a state legislature for the election of members of the Federal House of Representatives."

This Court abstained from action in 1964 for the many reasons listed in an abstention order. Chief among them was the avoidance of political disorder in the conduct of the congressional elections. The election calendar was already in motion with candidates already announced and no legislature was then in session. We further stated in that order that the Court had confidence that the Indiana General Assembly of 1965 would heed the

new judicially stated principles governing congressional districting of a state by the constituted legislature of Indiana.

Thereafter, the Supreme Court spoke again on June 15, 1964 in the case of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, following Wesberry v. Sanders, and I quote therefrom as follows:

"In that case (referring to Wesberry v. Sanders) we decided that an apportionment of congressional seats which
'contracts the value of some votes and expands that of others'
is unconstitutional, * * *."

The 1965 Legislature has met and by Chapter 205 created new congressional districts which do not follow the teachings of these Supreme Court Opinions. The majority of the states have substantially complied with the law and those who have not are for the most part now engaged in legal actions or legislative corrective action is under way.

It is unfortunate that the motives in redistricting creep into the issues on both sides of litigation and becloud the issues. If the legislature would but follow the teachings of the judicial interpretation of these cases the motives for the passing or opposing of the legislation by the majority and minority parties may be tolerated.

The facts are that the 1960 census places the population of Indiana at 4,-622,498 which makes the perfect district for the allotted eleven for Indiana at 423,863 inhabitants. The districts created had the following population contractions and expansions from such perfect constitutional district:

| | CONTRACTION | EXPANSION |
|---|---|---|
| 1st District | | 30,345 |
| 2nd District | | 7,301 |
| 3rd District | 39,784 | |
| 4th District | | 27,074 |
| 5th District | | 2,247 |
| 6th District | | 15,098 |
| 7th District | 54,200 | |
| 8th District | | 19,389 |
| 9th District | | 1,075 |
| 10th District | 17,645 | |
| 11th District | | 9,210 |

Examination of these districts when compared with the rule of "one vote—one man" and a substantial compliance therewith leaves no other rational conclusion but that a substantial number of the inhabitants of Indiana are paying with usurious votes in the selection of their congressmen and another substantial number are obtaining more voting power with their vote.

It may be judicially noticed that the seventh district was in a greater state of imbalance when the 1965 districting Act was passed over the 1960 census. Stating it another way the legislation was based on the 1960 census and the majority opinion and dissent opinion are also so based on 1960 population records.

It is gerrymandering. It is unnecessary to examine the gerrymandering motives of the minority and majority parties and influential factions in both very deeply. One sees that two minority congressmen are placed in completely new districts with only their home county retained from the old district in which the people had repetitively chosen them as their congressmen. In one instance a narrow strip of land was used to provide contiguous geography and circumvention

of the Indianapolis water reservoir which provided a natural barrier.

It is further evidenced by the casting of one minority congressman against another and thus reducing the minority delegation to Congress by one more without the voters' choice being exercised in enriching the majority by another. Gerrymandering is referred to in this opinion only to show the effect and thus point up the unconstitutional districting which my colleagues of the bench have countenanced. The gerrymander was at the expense of upholding the mandate of the Supreme Court.

The correction of the outsized and undersized districts to constitutional sized districts will of necessity change some of the other districts and will prevent unlawful gerrymandering and still permit room for lawful "politicing". If the Courts permit this then we do not have elections governed by fair rules and we unleash the forces of retaliation in political organizations of the kind we should abhor in organized society. The Attorney General of Indiana would have us return to the rule of the "political thicket". This trial court must follow the rule of law established by the Supreme Court.

The unquestioned facts before this Court are that Indiana and its legislature could and should have reapportioned Indiana by one of countless combinations by realigning of counties in groupings and/or townships in groupings. Any one of such combinations would have been constitutional and in accord with the teachings of the Supreme Court. Indiana then would be in the class of the majority of the states of the United States instead of resisting the clear mandate of the United States Constitution. The voters of the seventh district with 54,200 votes (based on the 1960 census) enjoy the privileges of a small district to the detriment of others. In order to keep it small and why it was so gerrymandered, the counties around its perimeter must be examined to ascertain why they were not annexed. What would have been the districting if they were removed from the surrounding districts? Thus, gerrymandering was extended to those districts. There is a place for gerrymandering but not at the expense of the rule of law governing the right of the inhabitants to equal voting power. The majority of this Court strongly recommends that the 1967 Session of the Indiana Legislature eliminate the abnormalities whereas it should be done now before the 1966 Congressional Election. Indiana should commence and maintain the ten year cycle of the Federal census and the many valid long enduring benefits to the established districts' peoples. The awaiting of a new legislature only compounds the unsettled state of Indiana's districts and permits another malapportioned Indiana Congressional Election in 1966.

I would find that the plaintiff and intervening plaintiffs had maintained their burden of proof of this action and declare Chapter 205 of the 1965 Acts of the Indiana General Assembly unconstitutional.