Gerald Nolan, J.
On January 13, 1966, judgment was entered, on plaintiffs ’ motion pursuant to CPLR 3212, declaring the present apportionment of the voting power of the Board of Supervisors of Westchester County to be unconstitutional, in violation of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States, and section 11 of article I of the Constitution of the State of New York. Other relief sought by plaintiffs was denied so that the Board of Supervisors might have an opportunity to adopt a plan of reapportionment consistent with constitutional standards prior to May 1, 1966, and the parties were given the right to seek further relief, at the foot of the judgment, at any time after that date.
It was stated at that time that “ in solving the problem presented it is neither practicable nor desirable to establish rigid mathematical standards and that the proper judicial approach is to ascertain whether under the particular circumstances existing there has been a faithful adherence to a plan of population based representation with such minor deviations as may occur in recognizing certain factors that are free from taint of arbitrariness or discrimination. So the Supreme Court has stated (Roman v. Sincock, 377 U. S. 695, 710). The same court has also clearly indicated, however, that if population should be submerged as the controlling consideration in the apportionment of seats in a legislative body the rights of all citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired (Reynolds v. Sims, 377 U. S. 533, 581, supra).” (See Town of Greenburgh v. Board of Supervisors, 49 Misc 2d 116,119.)
On April 18, 1966, the Board of Supervisors adopted a local law entitled “ A Local Law Amending the Westchester County Administrative Code in relation to membership and voting strength of the County Board” and the law was approved by *170 the County Executive on April 19, 1966. On May 2, 1966, a second local law was adopted, and was approved by the County Executive on May 9, repealing section 3 of the law adopted on April 18.
Section 4 of the Local Law provides that it shall take effect on January 1,1967, if a majority of the qualified electors voting thereon approve it at the general election of 1966, although the first election of additional members of the board, as provided by .section 1, is to be held in 1967 at the general election in that year and their terms are to commence on January 1, 1968. The local law, as amended, provides as follows :
1. It increases the membership of the board from the present representation of 45 to 54 members. (§12 [b].)
2. It increases the total voting strength of the board from the present 45 to 48 votes. (§ 12 [f].)
3. It provides for additional representatives called ‘‘ county legislators ” from certain towns with large populations as follows (§ 12 [b]): Greenburgh, 3; Cortlandt, 1; Eastchester, 1; Mamaroneck, 1; Mt. Pleasant, 1; Ossining, 1; Bye, 1.
4. It provides for fractional votes for those individual members representing 6 certain towns with small populations (Lewisboro, North Castle, North Salem, Pelham, Pound Bidge, Somers) and those members representing the cities of Mount Vernon and Peekskill. (§ 12 [f].)
5. It continues the representation of the other town and City Supervisors on the County Board. (§ 12 [a].)
6. Vacancies which occur and exist in the office of any additional member created by the local law are filled by appointment by the Town Supervisor (in his capacity as a county officer and member of the County Board) of the town to be represented by such additional member. (§ 12 [e].)
7. Finally, it provides for a reapportionment of the County Board after each Federal decennial census commencing with that for the year 1970 or after a county-wide special census, but this provision shall not apply, if the legislature by special law shall provide for the apportionment or reapportionment of the legislative body of any local government, while such special law shall be operative. (Emphasis supplied.)
The County Attorney, representing the defendants Board of Supervisors, the County Executive, and the Commissioners of Election of Westchester County, has moved for an order declaring that the local law complies with the order of this court and is consistent with the provisions of the Fourteenth Amendment to the Constitution of the United States, and section 11 of *171 article I of the Constitution of this State. The plaintiffs have cross-moved for an order nullifying the local law as unconstitutional as in violation of the same provisions of the Constitutions of the United States and this State, for injunctive relief, enjoining the defendants from submitting the local law for referendum, for other relief, including interim relief, and for substitution of the successors of two of the parties in their places as parties to the action. The motion for substitution is, of course, granted.
The Town of Yorktown has been permitted to intervene and claims that the local law discriminates against its residents, in that their voting strength has been substantially diluted, but concedes that the assignment of 1.25 votes to Yorktown’s Supervisor would cure the defect. The City of Mount Vernon objects to the local law because the 1965 census figures were used as a basis for the calculations made by the board and claims that the decennial census of 1960 should be used to determine the voting strength to which the city is entitled.
Although there is a substantial body of case law, both Federal and State, in which general principles with respect to legislative apportionment and reapportionment are stated, no detailed definitive standards have been provided which may be applied in the application of the “ one person, one vote ” rule to the apportionment of seats, or voting power, in local legislative bodies. Unquestionably plaintiffs have the burden of demonstrating that the local law denies to them, or to the residents of their respective municipalities the right to an effective vote in the election of members of the County Legislative body, and that the discrimination, of which they complain is invidious, and not the result of minor deviations from a plan of population based representation which have occurred in recognizing factors which are free from the taint of arbitrariness or discrimination (cf. Roman v. Sincock, 377 U. S. 695, 710, supra). Among the factors which apparently have been recognized are the historical role of the town as the unit of representation and the existence of city charters which dictate the number of City Supervisors who represent the cities of the county in the board. Whether these factors should be recognized is primarily a legislative problem, and no reason appears why the Board of Supervisors may not legitimately maintain the integrity of the various political subdivisions within the county, as a basis of representation, provided that the vote of any citizen is maintained, approximately equal in weight, if such a basis of representation shall be utilized, to the vote of any other citizen in the county (cf. Reynolds v. Sims, supra).
*172 We are informed that in adopting the local law the Board of Supervisors have tried to adhere to the standards provided by the court’s decision of January 13. It is obvious that the board has so tried, but the question which must be decided is whether the local law which resulted from their efforts complies with constitutional requirements of substantial equality in voting power, or differently stated, whether the parties who assert that it is unconstitutional have shown that the weight of their votes has been substantially diluted when compared with the votes of those living in other political subdivisions of the county (cf. Reynolds v. Sims, 377 U. S. 533, 568, supra).
Plaintiffs, in claiming that fractional voting, as provided by the local law, is unconstitutional describe the law as an “ ingenious hybrid ’ ’ of which fractional voting is only a part, and correctly state that it is an essential part of the law if the objective of keeping all town and city lines intact is to be attained. The law, they assert, provides for the following different types of districts and representation :
a. Six ordinary single-member districts (Bedford, Harrison, New Castle, Scarsdale, Yorktown, and the City of Bye).
b. Six single-member districts which elect a county legislator who has only a fractional vote at meetings of the board. (Pelham and the five small towns).
c. Eight ordinary multiple-member districts which elect from two to four full-fledged legislators at large within each district (Cortlandt, Eastchester, Greenburgh, Mamaronack, Mt. Pleasant, Ossining, Town of Bye and White Plains).
d. Two multiple-member districts which elect two and five county legislators, respectively, at large, each of whom has only a fractional vote at meetings of the board (Peekskill and Mt. Vernon).
e. Two apparent multiple-member districts which, due to subdivision of the cities into wards by their own laws, result in 12 and 4 single-member districts for election purposes (Yonkers and New Bochelle).
Whether fractional or weighted voting may be utilized as a permanent means of compliance with constitutional standards of population based representation, at the county level, is not free from doubt. It was disapproved as a means of apportioning voting power in the State Legislature, in WMCA v. Lomenzo, (238 F. Supp. 916) but the members of the court which made that decision were careful to state that they expressed no opinion “ on the use of fractional or weighted voting either as a temporary device to remedy malapportionment or in governmental organs below the state level. ’ ’ Obviously, fractional or weighted *173 voting has disadvantages which have been stressed in plaintiff’s argument but other disadvantages are apparent in the multiple-member district plan, which has met with judicial approval, and it is difficult to see how substantial equality in voting strength can be attained, as between the towns and cities in this county, by any method other than the weighting of the votes of their representatives, if the towns and cities are to be retained as the districts from which the legislators are to be chosen. It is the distribution of legislators, or of voting power, rather than the method of distributing legislators or voting power, which must satisfy the demands of the equal protection clause and the similar provision of our own Constitution (cf. Burns v. Richardson, 384 U. S. 73), and the fundamental right to be protected is equality in voting power,, as between the citizens of the political subdivisions of the county.
The local law is unique, in that it combines fractional voting in both single and multi-member districts with voting in single and multi-member districts in which each representative has a single unweighted vote, but there is, nevertheless, merit in the argument advanced by the defendants that voting power may be predicated on any numercial basis, whether weighted, fractional or otherwise, or any combination of methods, provided that the voting power of each legislator is substantially equal in the ratio that the population which he represents bears to the total population of the county.
The difficulty with the local law is that it fails to meet that test. We are informed that in making the mathematical computations the board found that the use of a numerical basis of 18,000 persons for each vote presented the plan which would lead to the least amount of fractionalizing, and would permit the least amount of deviation from that standard. There should be no quarrel with the selection of that figure as a norm or standard for population comparisons, if a 48 vote board is the objective to be attained, since if the county were to be divided into 48 districts of equal population each district would have a population of approximately 17,775 votes, according to the 1965 special population census of Westchester County. It is also stated, correctly, that in all but one instance the plan proposed results in representation for each town and city which is within an approximate 15% variation from the norm. By that the moving defendants mean that each legislator, except one, theoretically represents a district in which the population exceeds, or is less than, the 18,000 standard by approximately 15% or less. In three cases the variance is more than 15%. G-reenburgh’s variation with respect to each legislator is .151+, *174 Yorktown’s is .22+, and the variance of the population of the City of Bye is .153+. However, G-reenburgh’s variance is calculated by dividing its total population by four, and calculating the population variance by use of the quotient so obtained. The total variance of the population of Greenburgh over and above 72,000, the number which would require the allotment of four legislators on the basis of the 18,000 norm, is 10,882, or .60. Similarly in Yonkers, which has 12 supervisors, the population variance for each supervisor is about .07. The total population variance, however, is 14,427, or about .80. There are other variations from the 18,000 standard which are not inconsiderable although they are less than 15% in each case. A chart has been submitted which shows the numercial breakdown of the apportionment of voting power, as between the various political subdivisions of the county. We are not informed as to the manner in which the board applied the 18,000 standard in assigning additional legislators to some political subdivisions, and fractional votes to the representatives of others.
It could have been done under one of two plans, at least. If the board decided to give an appropriate fractional vote to the representatives of each town which had a population of less than two thirds of the 18,000 norm, and thereafter to assign legislators to the towns, on the basis of one legislator for each 18,000 in population, and each remaining fraction thereof of two thirds or more, the result would be consistent with such a plan in the case of each town but Pelham, and if the intent was to adjust the votes of the city legislators to such a standard, the result would also be consistent in the case of each city but Yonkers. However, the obvious objection to such a plan as a permanent cure for malapportionment, is that it permits too wide a disparity between the populations of the various towns and cities which will be used as districts from which legislators, having equal votes, will be elected.
The plan which appears to have been followed involves the assumption that the one person, one vote rule permits a single legislator with an unweighted vote to represent a unit of population which contains not less than 15,300, or 18,000 — 15%, nor more than 20,700 residents, or 18,000 + 15%, and that all towns having a population of less than 15,300 should be given fractional votes, and all towns and cities having populations in excess of 20,700 should be represented by more than one legislator, on the basis of one legislator for each 18,000 in population and each remaining fraction thereof greater than .15. Pursuant to this plan fractional votes roughly approximate to population variances were given to the representatives of the *175 six smallest towns in which the population variance exceeded 15%. Single representatives were permitted to continue to represent the towns in which the population variance did not exceed an approximate 15% and additional representatives were assigned in all hut one town in which the variance exceeded an approximate 15% so that such towns became, in effect, multiple member districts in which each representative had a single unweighted vote and represented a theoretical population unit of 18,000 + or — 15%, or less. The Town of Greenburgh did not fit conveniently into the plan, since it had a population of 82,882, or 10,882 over the multiple of 18,000 which required four legislators. Evidently the board rejected the alternative of assigning five legislators to Greenburgh on the ground that such a number would create an excess of over-represented districts and assigned four legislators, although if five had been assigned, each legislator would have represented a theoretical constituency of 16,572, roughly approximate to the representation in the cities of Yonkers and White Plains, and greater than the constituencies represented in Bedford, Cortlandt, Mamaroneck and the City of Bye. Each legislator assigned to Greenburgh will theoretically represent a population of 20,721, which is, however, only a variance of .151+ from the 18,000 norm. (The population representation in the multiple member districts is theoretical because no provision is made for subdistricting and the legislators are elected at large. Consequently, each representative so elected represents the entire population of his town and not a fraction thereof.) The Town of Yorktown was more difficult to handle under the plan adopted. With a population of 22,044, it exceeded the norm by more than .22, but if an additional legislator had been assigned to Yorktown each legislator would have had a theoretical constituency of only 11,022. Yorktown was not assigned an additional legislator and will have but one representative in the board under the local law.
In applying the plan to the city populations, the board was, of course, unable to reduce the number of representatives, since that number was created by city charters. There was, however, no difficulty in applying the plan to Yonkers, New Bochelle, White Plains and Bye, although the result was that the representative of Bye would represent but 15,232 residents. In Mount Vernon and Peeksldll, however, the board was compelled, in order to achieve approximate equality, to again resort to weighted voting, although these cities were multiple-member districts. Each representative from Mount Vernon was given an .80 vote and each from Peekskill, which has a *176 population of 18,504, was given a .50 vote in the board. It maybe conceded, therefore, that in providing for the reapportionment of its voting strength, the board did adhere to a plan of population based representation, with some deviations. Whether such deviations may be classed as minor, however, is at best debatable. In any event, the question remains whether, in recognizing the desirability of representation in the board by the towns and the cities and maintaining the integrity of the town and city lines, the board has submerged population as the controlling consideration in the reapportionment plan. Mathematical precision, of course, can never be attained, nor is it a practical test of apportionment. Population, however, must be the overriding consideration in any apportionment plan, and the board is required to apportion the voting strength of its members in such manner that the vote of each citizen shall be as equal as may be practicable to the vote of any other. It does not appear from the figures submitted that this result has been accomplished.
Under the local law Yorktown, with a population of 22,044, has a single legislator with one vote, as has the City of Rye, with a population of 15,232, or approximately 66% of that of Yorktown. Substantial desparities also exist between the population of Yorktown and that of Bedford with 15,867 in population, and Cortlandt, Mamaroneck and Ossining each of which has legislators representing, theoretically, less than 16,000 in population. The legislator from the City of Rye will represent a district with over 5,000 in population less than that of the theoretical district to be represented by each legislator from Greenburgh, and similar comparisons may be made between Greenburgh and Bedford, Cortlandt, Mamaroneck and Ossining. Similar disparities exist between Harrison, with a population of 20,433 and Bedford and the City of Rye, and similar comparisons may be made with respect to Harrison’s population and the population representation of Cortlandt, Mamaroneck and Ossining. Other disparities are equally apparent. One of the acceptable features of the proposed plan is that a minimum of 48% of the population of the county can, theoretically, at least, elect a majority of the members of the board, but it seems apparent that whatever the permissible results of the plan may be, they will be attained, if it shall be approved, by the substantial dilution of the votes of the residents of Green-burgh and Yorktown and of others whose representatives make no complaint, however, on these motions. This dilution can be avoided by a more consistent adherence to the methods of obtaining equality which have been employed in the law, and with *177 no greater risk of unconstitutionality. The law is intended to provide a permanent remedy for existing malapportionment and its provisions for fractional votes by representatives of certain towns and cities are obviously designed to provide equality in voting strength between the political subdivisions of the county. Presumably the board considered this method of equalization constitutional, and it will be presumed that it is. But if fractional, or weighted, voting is permissible and desirable to equalize voting strength between towns and cities in some cases, it is difficult to understand why it should not be equally so in others. Indeed, if we are to accept, as we must, the principle that population may not be submerged as the controlling consideration in the apportionment of voting strength (cf. Reynolds v. Sims, 377 U. S. 533, 581, supra) the conclusion seems inescapable that if the votes of some legislators may be weighted to create equalization of voting strength, the votes of others must be if a result more consistent with equality may be obtained thereby.
It is obvious that a result more consistent with complete equality would be obtained if the votes of the present Supervisors should be weighted, either fractionally or otherwise, and a similar and better result may be obtained by the use of the same device in connection with the assignment of voting strength to the legislators to be elected under the local law. For instance, each legislator from Mount Vernon has been given an .80 vote to conform his voting strength to the 18,000 norm. A similar result could readily be obtained by assigning the legislator from Yorktown a 1.25 vote. It is not necessary to decide, on these motions, whether fractional or weighted voting is per se, constitutionally impermissible, although the argument is made by the League of Women Voters, amicus curiae, that it is. For obvious reasons such questions are not ordinarily considered unless their decision is necessary in the determination of the issues presented by the parties (see Hanrahan v. Terminal Station Comm., 206 N. Y. 494, 504) and no party has contended that it is not permissible if the principle is properly applied. Plaintiffs contend only that fractional voting is unconstitutional, as it is utilized in the context of the local law. However, some further discussion of the subject is appropriate, if not necessary, since the question is one to which the board may wish to give further consideration. If it is the thrust of the recent decisions of the Supreme Court of the United States that the application of the “ one person, one vote ” rule requires that the vote of each citizen shall be approximately equal to the vote of any other, so that he may *178 participate through his elected representative, not only in the vote in a legislative body for or against legislation, but may also participate on an equal basis in other activities of the legislators, such as committee work, debates on the floor, consultations with other branches of government, discussions of pending measures, and the like, weighted voting is not, of course, the answer to the problem, and any plan of reapportionment which provides for the election of legislators from small towns, even with fractional votes, will be vulnerable to attack by the residents of the large towns and cities. But no controlling authority has as yet so held with respect to a legislative body at the county level, and under circumstances such as those disclosed here weighted voting could have obvious advantages. The objections to weighted voting are apparent if by such device unequal representation is afforded the areas of a State which are sparsely populated, so as to perpetuate control by rural over urban areas or where a monolithic voting power may be created in the control of a single representative. The latter result at least will be avoided by the creation of multiple-member districts in the large towns, and weighting the votes of the legislators elected therefrom, and it does not appear that weighting the votes of the county legislators will give control to any section of the county population over any other. Weighted voting, if properly employed, will obviously help to attain a closer approximation to equality, and if reasonably applied should not unduly burden the legislative process. As has been stated, it appears to be the only practical method of obtaining substantially equal population based representation in the board in this county, if the towns and cities are to be retained as the districts from which legislators are to be elected. It has been utilized in Nassau County apparently without claim of unconstitutionality, since 1938. Although it is difficult to speak with authority on the subject, in the present state of the law, this court is not inclined to hold, in the -absence of controlling authority, that weighted voting, fractional or otherwise, is constitutionally invalid if properly employed so as to afford equality in population based representation in the county board. However, its limited use in the context of the local law is not permissible under the circumstances and with the results here disclosed, and plaintiffs are entitled to the relief demanded in their notice of motion, except injunctive relief and the fixing of a date upon which the terms of the present supervisors shhll terminate. Neither of these, forms of relief appears to be necessary or desirable at this time.
*179 In view of the foregoing discussion, it is unnecessary to discuss further the argument presented by the Town of Yorktown, except to say that Yorktown’s contention that the votes of its residents will be substantially diluted when compared with the vote of residents of other political subdivisions of the county, if the local law shall be approved, is well grounded. Yorktown and the City of Rye, for instance, have a combined variance from the 18,000 vote standard adopted by the board, of upwards of 37%, and their population variance ratio is 1.45 to 1. These disparities are substantial, as are the disparities between the voting power of Yorktown’s residents and the residents of other towns and cities in the county. Neither is it necessary, in view of the conclusion reached on the motion by the Town of Greenburgh, to discuss at length the argument by the City of Mount Vernon that the 1960 decennial census should have been used to determine the voting strength to be allotted to its residents. In 1960, Mount Vernon had a population of 76,010 and, according to the 1965 special census, its population was 72,918. It will be entitled to some relief, if fractional or weighted voting is to be utilized on the basis of the 1960 figures, but not if those figures are not to be employed. The question presented is of some importance, however, in connection with the problem of interim relief. The use by the board of the 1965 figures does not appear to have been erroneous and no party but Mount Vernon contends that it was. The 1965 special census was taken pursuant to a contract between Westchester County and the United States Bureau of the Census as authorized by section 20 of the General Municipal Law, for the purpose of computation of State assistance to local government pursuant to section 54 of the State Finance Law, and was certified by the Director of the Bureau of the Census, and filed with the State Comptroller. Concededly, the City of Mount Vernon withdrew the special population census so filed in its behalf, as permitted by section 54 (subd. 3, par. b) of the statute. Withdrawals were also filed by other cities and villages within the county, and by the county itself. Presumably the county, the City of Mount Vernon, and the other municipalities which have withdrawn are not receiving State assistance on the basis of the 1965 special population census. It is, nevertheless, the most recent official census of the population of the county, and the towns, villages and cities contained in it, and furnishes impartial population data on the basis of which an apportionment plan may properly be developed (see Seaman v. Fedourich, 16 N Y 2d 94,104), and the certificate of the officer in charge of the census, *180 if attested by the United States Secretary of Commerce, may ■furnish conclusive evidence of such population (CPLR 4530, subd. [b]).
There remain to be considered the questions of permanent reapportionment and interim relief. With respect to permanent reapportionment, the court is still reluctant to prescribe the type of representative government which is best suited for the County of Westchester, although the power to act, if appropriate action by the board shall not be taken is clear (see Matter of Orans, 15 N Y 2d 339, id. 17 N Y 2d 601, id. 17 N Y 2d 107). The court is not unmindful of the difficulties involved in the problem of reapportionment, particularly in the instant case, or of the fact that the Supervisors are required to act in a new and developing field of the law in which the rules are not well defined. The disapproval of the local law is not intended to imply that the Supervisors have not attempted in good faith to comply with constitutional requirements, and to give fair and adequate representation to all the people of the county. It is true that a denial of constitutional rights demands judicial protection, but such protection may be adequately provided by interim relief, and there are other methods of providing the necessary equality in voting strength which the supervisors may wish to consider, including districting, which may perhaps be easier to effect, in view of the approval by the Court of Appeals of the plan submitted by the Judicial Commission in the Orans case (17 N Y 2d 107). That, however, is a legislative problem. No plan of permanent reapportionment will be prescribed by the court at the present time, and the matter will be remitted to the board for further consideration. The court will retain jurisdiction for all purposes, with the right to any party to seek further relief at any time after December 1, 1966, or prior to that date if action shall be taken by the board to adopt a plan of reapportionment consistent with constitutional standards. In the meantime, the votes of the supervisors in the towns and in the City of Rye shall be weighted, on the basis of one vote for each 1,000 in ■ population, and remaining major fraction thereof. In the other cities the population of each city shall be divided by the number of Supervisors elected therein, and the vote of each such Supervisor shall be weighted on the basis of one vote for each 1,000 in population, and each major fraction thereof contained in the quotient so obtained, with respect to the population of the city which he represents. (A similar result may be obtained by weighting the votes on the basis of a tenth of a vote for each 1,000 in population and remaining major fraction thereof, and the order to be presented *181 may so provide if counsel shall be so advised.) For the purpose of the necessary computations, the 1965 special population census shall be used.
The order to be presented may provide that within 10 days after the order shall be filed the County Clerk shall make the required calculations, file the result with the papers in this action, and file a certified copy thereof with the Board of Supervisors, and that thereupon each Supervisor shall be entitled to cast the votes assigned to him by such calculation and not otherwise,, pending further order of the court. It is realized that this interim plan does not provide the ideal method of voting in the board. It has the advantage, however, of distributing the voting strength of the board on a basis which complies with constitutional requirements of one person, one vote. The largest population vote will come from the City of Peekskill (1028) and the smallest from Somers (950). The population ratio between the largest and the smallest will be 1.08 to 1, and the minimum percentage of the population of the county necessary to elect a majority of the board will be 49.6%. Whatever its faults may be, it will at least provide for equality in voting strength as between the cities and towns of the district, until a permanent and a better plan can be adopted.
The industry and co-operation of counsel are appreciated, as are the assistance and civic-minded interest of the League of Women Voters of Westchester County. Submit order accordingly, on notice.