Gerald Nolan, J.
Westchester County has a total population, according to its 1965 special census enumeration, of 853,198. It contains 18 towns and 6 cities. The towns range in population from 82,882 in Greenburgh to 2,924 in North Salem. Among the cities, Yonkers has the largest population with 201,573, and Rye has the smallest, with 15,232. In accordance with the provisions of the Town Law (§§ 10 and 20) which provide that each town in the county shall have a Supervisor, and the County Law (§ 150) and the Westchester County Administrative Code (L. 1948, ch. 852, § 12) which provide that the Supervisors of the several cities and towns shall constitute the Board of Supervisors, the board has 45 members, one from each town, 12 from Yonkers, 5 from Mt. Vernon, 4 from New Rochelle, 3 from White Plains, 2 from Peekskill, and 1 from Rye. When this action was commenced each supervisor had one vote, so that the Town of Greenburgh with 82,882 in population had no greater voting power in the board than North Salem, with 2,924, and less than any of the six cities except Rye although its population was greater than that of any of them, except Yonkers. It was to correct this inequity in representation that Greenburgh sought relief, claiming that its citizens were denied equal protection of the laws, as guaranteed by the Fourteenth Amendment to the Constitution of the United States, and t section 11 of article I of our own Constitution, whose equal | protection clause is as broad in its coverage as that of the l Fourteenth Amendment. (Dorsey v. Stuyvesant Town Corp., 299 N. Y. 512, 530, 544.) On January 13, 1966, the plaintiffs Town of Greenburgh and its Town Board were granted relief, by way of summary judgment, declaring the apportionment of voting power in the board to be unconstitutional. The court, however, did not declare the provisions of the Town or the County Laws, or the Administrative Code unconstitutional insofar as they provided for the composition of the Board of Supervisors, or grant other relief requested, but provided that the board might have a further opportunity to adopt a plan *90 of reapportionment consistent with constitutional standards. (Town of Greenburgh v. Board of Supervisors, 49 Misc 2d 116.)
On April 18, the board adopted a local law providing for an apportionment plan, which was submitted to the court for approval. That plan was rejected, again because of inequities in representation, as between the towns and cities, an interim weighted voting plan was directed to be put into effect, weighting the vote of each Supervisor, in proportion to the population of his constituency, and the parties to the action were given leave to seek further relief on or after December 1, 1966, or prior to that time if the board should adopt a permanent apportionment plan (Town of Greenburgh v. Board of Supervisors, 51 Misc 2d 168.)
On October 3, the Committee on Legislation of the Board of Supervisors submitted its report recommending that the board submit two plans designated as Plan No. 7 and Plan No. 8 to the court for review, before the adoption of a local law. The board did not adopt the recommendation in its entirety, but did submit Plan No. 8 for approval by motion returnable on October 14. On that date the individual plaintiffs, members of the League of Women Voters of Westchester County, were permitted to intervene. However, since no public hearing had been held with respect to the proposed local law, and it had not been adopted, decision of the motion for approval was held in abeyance pending further action by the board. Thereafter and on November 21, 1966, the Board of Supervisors adopted the proposed law, which was disapproved by the County Executive on November 28, and repassed over his veto on the same day. Since that date hearings have been held by the court and the controversy has been fully submitted. The court is now required to determine whether the local law meets constitutional requirements for full and effective citizen participation in the political processes of the county’s legislative body. (Cf. Gray v. Sanders, 372 U. S. 368; Reynolds v. Sims, 377 17. S. 533; Seaman v. Fedourich, 16 N Y 2d 94.)
The local law adds nine additional legislators to the board, increasing the number from 45 to 54, and distributes legislative seats and voting power according to a “ modified weighted voting ” plan, which retains the towns and cities of the county, as the districts from which the legislators are to be elected, and purports to equalize the voting power of the legislators by providing multiple votes for all legislators and additional legislators for the larger towns, so that the vote of the legislator or legislators from each district is substantially proportional to the population of the district which he or they represent. A detailed *91 analysis of the plan, insofar as it involves the distribution of the legislative seats, and the vote in the board is shown in the following table:

According to the plan, if approved, there will be 11 towns which will be single member districts (districts with a single representative) and 7 towns which will be multimember districts (districts in which two or more representatives will be elected at large). Additional representatives have been allotted in the multimember districts substantially on the basis of one for each additional 18,000 or major fraction thereof, in population. Votes have been assigned to each legislator on the basis of one for each 1,000 in population, and each remaining major fraction of 1,000. In the cities there will be one single member district, three multimember districts, and two districts, Yonkers and New Rochelle, in each of which representatives will be elected from wards, in accordance with city charters. The number of representatives from the cities could not be changed consistently with relevant statutes, since the charter of each *92 city had provided the number of Supervisors to be elected, as city officers. In the cities which were to constitute multiple member districts, therefore, votes were apportioned among the Supervisors on the basis of one for each 1,000 of population by dividing the population in each case by the number of Supervisors, and assigning votes according to the quotient so obtained. In the Cities of New Rochelle and Yonkers, although the Supervisors will not be elected at large, and the wards of the cities will constitute the districts from which they will be elected, the same procedure was followed and these two cities have been treated as multimember districts. The population figures which were used as the basis of the apportionment were taken from the 1965 special population census of Westchester County, which does not disclose the populations of the wards in either city, and apparently it was assumed in the absence of evidence to the contrary that the wards were of substantially equal populations. Under the local law, if this distribution of legislative seats and voting power may be sustained, the result will be that the mean population represented by each vote in the board will be 991. The largest constituency represented by a single vote (Peekskill) will be 1028, and the smallest (Somers) will be 951. The population variance between the largest and smallest constituencies will be 1.08 to 1., and the maximum variance from the mean will be 1.04 to 1. The votes of at least 49.9% of the population of the county will be required to elect a voting majority in the board. A numerical majority of the legislators (28) may be elected by the vote of the residents of towns and cities which have a combined population equal to 43.59% of the total population of the county. The legislators so elected, however, will be able to cast a vote which will represent only 43.67% of the total vote of the board. The law further provides for reapportionment after each decennial or . special census, and is to take effect January 1, 1968. The additional legislators are to be elected at the general election of 1967, and the local law is to be submitted for approval at a special election to be held April 18,1967.
Since the commencement of this action, the positions of the parties have changed. The Town of Greenburgh and its officials, who were the original plaintiffs, and who were granted judgment declaring the voting power of the Board of Supervisors, as it was distributed at that time, to be unconstitutional, now take the position that the local law, since adopted, is constitutional, and the Town of Yorktown has apparently taken the same position. The County Executive, although he has not chosen to express his present views through counsel, other *93 than the County Attorney, has disapproved the local law, for the reasons stated in his veto message. The Common Council of the City of Mount Vernon takes the position that the local law is unconstitutional, as do the plaintiffs, members of the League of Women Voters, who have intervened. Both assert for various reasons which will be discussed, that the local law violates the equal protection clauses of the Constitutions of the United States, and of the State of New York.
Before discussion of the constitutional questions, however, it should be stated that they are the only questions which may be considered. Unquestionably the administration of the local law will involve complications which would not be encountered if the law had provided for representation on the board by legislators elected from districts of equal population. Unquestionably, also if the Board of Supervisors had decided to adopt such a plan, providing for properly constructed districts, and equal representation therefrom, the constitutional objections to the present law would have been avoided. Perhaps other plans could be adopted which might appear to be more desirable from the viewpoint of some residents of the county, and perhaps there is no longer any need, nor is it desirable to retain the towns and cities as the districts from which legislators should be elected to the county board. However, questions of wisdom, desirability, need or appropriateness are for the legislative branch of the government, and not for the courts to determine. The sole function of this court, at least at present, is to determine whether the local law fails to meet constitutional requirements for population based representation, on the county Board of Supervisors. ‘1 Representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State’s legislative bodies.” (Reynolds v. Sims, 377 U. S. 533, 565, supra.) Each citizen has, of course, the same right with respect to the processes of his county Board of Supervisors (Seaman v. Fedourich, 16 N Y 2d 94, supra). That right will be denied him, unless he can exercise through his elected representative, an influence on legislative determinations equal to that of any other resident of the county.
It is contended that the citizens of Westchester County, and in particular those who reside in the smaller electoral districts will be deprived of proper representation and of equal legislative influence through the combination of weighted voting and multiple representation employed in the local law. Whether they will, or will not suffer such deprivation depends on the *94 answers to questions which the relevant case law has so far left unanswered. The litigation which resulted in the promulgation of the “ one person, one vote” rule by the Supreme Court of the United States was concerned with the correction of inequities in representation as between districts (see Reynolds v. Sims, 377 U. S. 533, supra and companion cases), or as Mr. Justice Douglas put it in Baker v. Carr (369 U. S. 186, 244) the question was 1 ‘ may a State weight the vote of one county or one district more heavily than it weights the vote in another?” However, it is not entirely clear, since the cases in which the determinations were made involved the apportionment of legislative seats and did not involve questions similar to those presented here which involve the allocation of voting power, whether the “ one person, one vote ” principle requires the equalizing of voting power at the citizen level by nothing less than the creation of districts of equal population, to be represented by the same number of legislators, with equal votes, or may be complied with by giving each legislator, as the representative of the citizens in his electoral district effective legislative influence proportional to the population of the district or fraction thereof which he represents, even though the districts may be of substantially unequal populations. If the latter practice will comply with constitutional requirements, there does not appear to be any method by which it can be accomplished, in the instant case, except by the employment of weighted voting, multimember districts, or a combination of both, and the question then arises whether the citizen’s right to fair and effective participation in legislative processes includes the right to population-based representation on legislative committees, or in other legislative activities (cf. Y.M.C.A. v. Lomenzo, 238 F. Supp. 916). None of these questions have been answered with finality, at least with respect to legislative apportionment at the county level, although there may be some indication that plans involving multimember districts will be acceptable at the State level if the population bases per representative are substantially equal. (See Swann v. Adams, 385 U. S. 440.) Certain fundamental rules appear to be clear, however. Although some deviations from population-based representation may be permitted for the purpose of insuring some voice to political subdivisions, as political subdivisions, and a legislative body may legitimately desire to construct districts along political subdivision lines, population may not be submerged as the controlling consideration in the apportionment of legislative seats or voting power (Reynolds v. Sims, 377 U. S. 533, 581, supra). It appears to be equally *95 clear that when a rational plan for legislative apportionment has been submitted (cf. Swann v. Adams, supra) those who assert that it is unconstitutional have a heavy burden to sustain. Courts strike down statutes as unconstitutional only as a last resort. It is not sufficient that those who attack them may succeed in establishing that there is some doubt as to their validity. Unconstitutionality must be demonstrated beyond a reasonable doubt. (Cf. Wiggins v. Town of Somers, 4 N Y 2d 215, 218, 219 and cases cited.)
Whether population has been submerged in the plan presented by the local law, as the controlling consideration, may be fairly debatable. One of the dominant purposes of the plan is to continue to give separate representation in the board to the residents of each town, and each city in the county, by retaining the town and city Supervisors as members of the board, with the result that inconsistencies appear in the apportionment of legislative seats which would not be present if a plan had been adopted providing for equal representation from districts of equal population. Although additional legislators are assigned to the larger towns, roughly on the basis of one for each 18,000 residents, a single legislator is assigned to each of the small towns with population ranges of from 13,666 to 2,924. In the cities, New Rochelle, with a greater population than Mt. Vernon, has 4 legislators, to 5 for Mount Vernon, and Peekskill, with 18,504 residents, has 2 legislators. Nevertheless the legislators with the smaller constituencies have less votes in the board, and the assignment of votes, or voting power, is strictly proportional to populations. Such being the case if the assignment of legislative seats and voting power may be sustained it does not appear that population has been unduly submerged as a controlling circumstance, within the meaning of the requirements of the “ one person, one vote rule.” However, when tested by established rules, the plan presented in the local law is clearly unacceptable. Throughout the course of this action, until the present law was submitted for approval, all parties realized that no evidence had been produced as to the populations of the wards in the City of Yonkers, and in New Rochelle. However they were apparently satisfied, perhaps relying on the presumption of regularity which attaches to the acts of public officers, that the wards of these cities were of substantiallly equal population, and no complaint was made of the allocation of 17 votes to each Supervisor in Yonkers, and 19 to each in New Rochelle. It has now been asserted and conceded, however, that in the City of Yonkers the ward lines are not drawn on the basis of population but are drawn so *96 as to provide for ward representation on the basis of the number of registered voters residing in each ward. In Burns v. Richardson (384 U. S. 73) use of a registered voter basis for the legislative apportionment there involved was approved only because on the record in that case it was found to have provided a distribution of legislators not substantially different from that which would have resulted from the use of a permissible population base. In all other cities, and the towns in the county, legislative voting power is distributed on the basis of population. In Yonkers, however, with a population of upwards of 23% of the total county population, the distribution is on the basis of the number of registered voters, and the evidence produced does not establish that this plan has produced a distribution of legislative, or citizen voting power similar to that which would have resulted from the use of a population base. In fact, insofar as it establishes anything, the evidence demonstrates that there are possible disparities between ward populations which are entirely inconsistent with any rational plan for population-based representation. According to the evidence produced, which establishes only possible maximum and minimum populations for the wards in the city, the possible variation of the per capita vote per legislator, from the mean of 991, could be —19% in the First Ward, — 30% in the Second Ward, — 22% in the Sixth Ward,— 41% in the Eleventh Ward, +34% in the Third Ward, +36% in the Fifth Ward, and +54% in the 10th Ward. Even the average figures show substantial disparities, not only as between wards in the same city, but also as between such wards and the towns and other cities in the county in which the legislators have been assigned the same or substantially the same number of votes. The population variance from the mean, of the largest constituency and the smallest in Yonkers could be 95%, and the variance of the largest and the smallest average populations could be 41%. As a result it appears from the conceded facts, that there is no basis for the conclusion with respect to the 12 Supervisors from Yonkers, that the citizens of the wards from which they are elected can exercise through them a legislative influence equal to that of other citizens in the county or even in the same city. The conclusion is inescapable, also, that although the policy of according legislative representation in the Board of Supervisors, to the cities of the county, may be clearly rational, and the considerations upon which it rests may be substantial, population has been submerged as the controlling consideration, insofar as the City of Yonkers is concerned. No reason appears or can be reasonably demonstrated, why such population variances should be *97 permitted to exist, even for the purpose of effectuating such a policy. (Cf. Swann v. Adams, supra.) Population figures for New Rochelle have been produced and show some disparity in ward populations, which might be disregarded, if the allocation of votes to the Yonkers Supervisors could be justified. The figures for New Rochelle also show, however, that if the population base had been consistently applied in that city, one Supervisor should have been assigned 17 votes and another 21, instead of 19. Even these deviations are hardly consistent, without adequate explanation, with faithful adherence to a plan of population-based representation (cf. Roman v. Sincock, 377 U. S. 695, 710).
This discussion might well end here if it were not for the fact that the opponents of the local law have advanced additional arguments with respect to the employment of weighted voting and multimember representation as a permanent remedy for legislative malapportionment. Although determination of the issues so raised may not be necessary, some discussion of them may be helpful in facilitating appellate review.
It must be conceded that plans involving weighted voting, and multimember electoral districts are not constitutionally acceptable if they do not do at least what they purport to do, that is, if they do not allocate effective voting power to legislators in proportion to the population that each represents. It is asserted that they do not, and that such plans inevitably result in discrimination, and are inherently unconstitutional devices for curing malapportionment in legislative bodies.
Both devices have features in common, and are similar in theory in that both are employed as corrective measures to remedy disparities in voting power in districts of unequal population. For instance, in a hypothetical case involving four districts, A, B, O & D, each represented by a single legislator with a single vote, if each of Districts A, B, & O has a population of 400, and D has a population of 2,500, it is apparent that the vote of a resident of District A, B, or C has a greater weight than the vote of a resident of District D. In District D, obviously, the citizens, each of whom has a vote of 1/2500 of the total vote of his district, must vote a greater number of times than the citizen in District A, B, or C, before the effect of their voting is equivalent. The effect of the overweighting of the votes of the citizens of the smaller districts, in terms of legislative representation, is apparent, since the residents of Districts A, B, & O can elect three representatives who can outvote the single representative from District D, even though he represents 2,500 constituents, and they represent only 1,200. Although the cited case is hypothetical, a comparable situation existed in the Board of Super *98 visors when this action was commenced and in the State Legislatures involved in the litigation which resulted in the establishment of the “ one person, one vote ” principle, in the 1964 decisions of the Supreme Court of the United States. The corrective measure applied to correct this inequity at the legislative level under a weighted voting system, is ordinarily, to give the representative from District D a greater number of votes proportionate to the population which he represents, and under a multimember voting plan, to give District D additional representatives in proportion to the population of the district. This might be done in such a case by giving District D, 6 votes or 6 legislators. There is a third method, “ modified weighted voting ” which is employed in the local law, which involves adding additional representatives, and additional votes, to effect population-based representation. Under this method District D might be given 3 representatives, with 2 votes apiece. Obviously, under the stated conditions, with respect to these four districts, and under many others which can be readily hypothesized, weighted voting will not effect a cure. Although the voter in District D is now represented by a legislator who has been given 6 votes, and each legislator’s vote is proportional to the population of his district, the legislators from Districts A, B, & C who have only one vote apiece have no voting power whatever, since, with a total of three votes, they can never enact or defeat legislation over the opposition of the representative of District D, with six.
Under the multimember or modified weighted voting plans the result might be different. Since the six votes will no longer be cast, necessarily, as a block, the representatives of Districts A, B, & 0 may have an effective and meaningful vote in a situation in which the representatives of District D cast conflicting votes. Other situations may exist, under which the weighting of votes will be entirely ineffective. For instance in the case of five districts, four of which have 300 residents and one of which has 100, it will make no difference whether each district has a representative with one vote, or whether four have representatives with 3 votes apiece, and the one-hundred resident district is given a representative with 1 vote. In either case, each representative has equal voting power, since the vote of three representatives will be required to make a majority. The same result will follow in all similar situations. There are many other hypothetical situations, and undoubtedly some exist, which also demonstrate that the actual voting power of a legislator is not necessarily equivalent to the number of votes which he casts in the legislative body. The argument has merit, therefore, that the voting power of a legislator, and consequently the effective legislative repre *99 sentation of Ms constituents should be measured not by the number of votes which he casts, but by the number of times, in all possible voting combinations, that the legislator can cast an effective vote, that is, the number of times when the votes of all other members of the body may be so evenly divided that he can change the result of the vote, on a pending measure by changing Ms vote from aye to no, or from no to aye. Weighted voting plans should not be condemned, however, because weighted voting may produce inequitable results under some circumstances. Weighted voting will, or will not produce effective legislative influence, proportional to population according to the circumstances which may exist, in any given case, and the plan provided by the local law, if otherwise acceptable would, in the instant case, produce that result. Mathematical computations, as shown by Table II, which is reproduced at the end of tMs opinion, demonstrate that, under the plan each legislator would have not only a weighted vote, but also an effective vote which would be proportional to the number of his constituents. It may be seen from the table, on which Column B represents the number of weighted votes cast by each legislator, Column C the number of effective votes which may be cast by each legislator, Column D the proportion of the total weighted vote cast by each legislator, and Column E the proportion of the total effective vote which each legislator may cast, that a legislator from the Town of Green-burgh casts 2.439% of the total weighted vote, and may cast 2.447% of the total effective vote. Similarly a legislator from Eastchester, White Plains or Yonkers casts 1.974% of the total weighted vote, and may cast 1.974% of the total effective vote, and a voter from Pound Ridge casts .348% of the total weighted vote, and may cast .346% of the total effective vote. The weighted votes, and the effective votes cast by all other legislators, are similarly proportionate. None of these calculations wMch disclose only slight disparities appear to indicate any invidious discrimination insofar as legislative influence, and effective representation are concerned, and it is only the invidious discrimination which is prohibited by the equal protection clauses with which we are here concerned. (Cf. Williamson v. Lee Optical Co., 348 U. S. 483, 489; Reynolds v. Sims, 377 U. S. 533, and companion cases.)
It is nevertheless contended that there still exists an invidious discrimination against the residents of the smaller districts, in terms of effective citizen influence on legislative determinations. It is argued, that although as between districts of unequal population, each having a single representative, the citizen of the smaller district has greater voting power, and casts a more *100 effective vote than the citizen of the larger district, the voting power of the citizen in either district is not proportional to the population of his district, but is inversely proportional to the square root of the population. The difference in voting power of the citizens of two districts of unequal population may be demonstrated mathematically by measuring the voting power of the citizen in each district by the number of times, in all possible voting combinations in his district, that he can cast a critical vote, and comparing the voting power of the citizens of the two districts as so determined. Thus, in the case of the four districts, A, B, & G having 400 residents each and D having 2,500, the voting power of the resident of A, B, or C so measured is not 6lA times as great as that of the resident of District D, but is 5/2, or 2% times as great. Consequently the resident of District D does not need 6 legislative votes, or 6 legislators to equalize his voting power, and if he has been given that relief, he has been overcompensated, and his voting power and his effective legislative representation as compared with the voting power and representation of the voter in the smaller districts have been overweighted accordingly. It is asserted that this overweighting of the citizen’s voting power, and legislative representation is just as apparent in the multimember districts as it is in the single member districts in which the single representative has an over-weighted vote, since each legislator will vote in accordance with the wishes of a majority of his constituents, and if the multimember representatives could poll their constituents, all would vote alike, in accordance with the wishes of even a minimal majority, on each issue.
Under this analysis, the citizen’s voting power is overweighted, to the extent that his representative is given votes, or his electoral district is given representatives, in excess of the number which would have been assigned, if votes or legislative seats had been distributed in proportion to district population square roots. Nevertheless it is obvious, and conceded that under any plan which employs electoral districts of substantially unequal populations, effective population-based legislative representation cannot be obtained by distributing legislative seats, or votes in proportion to population square roots. Whatever this may accomplish in giving a legislator voting power commensurate with that of the citizen, in his district, it will not give him a legislative influence, proportional to the population of the district which he represents. For instance, in the situation heretofore considered with Districts A, B & Ú having populations of 400 each and District D a population of 2,500, whether votes or legislative seats are to be distributed, 2, 2, 2 and 5, the results will *101 be the same. In either case the three small districts with a total population of 1,200 will be able to outvote District D with a population of 2,500, and control, by minority rule, the deliberations of a legislative body consisting of the four representatives.
Table III, introduced by the opponents of the local law, and reproduced at the end of this opinion, is an analysis, supported by the testimony of qualified witnesses of the overrepresentation from the standpoint of citizen influence, of the various electoral districts, as compared with the least populous district, with 3 votes. Concededly, as has been stated, and as the table indicates this overrepresentation cannot be remedied by the allocation of votes or legislators on a square-root basis. The analysis is concededly theoretical, since it assumes that the legislators will react to an imaginary poll of their constituents, in voting- in the legislative body, and does not take into account many practical considerations which might affect legislative votes. However, it does indicate a potential influence which is not proportional to the citizen’s effective voting power in his electoral district, which is inherent in systems employing electoral districts of substantially unequal population, and which cannot be remedied, unless all county legislators are to run at large in the county, by any apportionment plan except one which employs only districts of equal population.
If the 1964 “ one person, one vote ” determinations of the United States Supreme Court mean precisely that, and the dominant right which is required to be protected is equality of voting power at the citizen level, as many of the broad statements in the opinions in those cases appear to indicate, nothing remains to be done except to direct the Board of Supervisors to subdivide the county into districts of equal population, and apportion the legislative seats accordingly, even though the difficulties in effecting such a plan are apparent.' However, perhaps because none has been asked to do so, no court of controlling authority has so far struck down a reapportionment law because of the potential discrimination disclosed by the calculations made by the witnesses who testified, and illustrated by the table above referred to, or even because of the disparities in effective influence, which may result from weighted voting proportional to population. The Supreme Court of the United States has approved the concept of multimember districting in a number of cases, and our Court of Appeals has approved it in at least one, although it does not appear that the argument here advanced was presented in any of them (see Fortson v. Dorsey, 379 U. S. 433; Burnette v. Davis, 382 U. S. 42; Harrison v. Schaefer, 383 U. S. 269; Crawford Co. Bar Assn. v. Faubus, 383 U. S. 271; Burns v. *102 Richardson, 384 U. S. 73; Michl v. Shanklin, 50 Misc 2d 460, affd. 25 A D 2d 925, mod. 17 N Y 2d 906).
The Supreme Court did state, however, in Fortson v. Dorsey (supra, p. 438), where the argument was advanced that a resident of one of seven subdistricts in Fulton County, (a large multimember district, in which the subdistricts were designated only as the basis of residence requirements) was discriminated against, because he had to join with residents of the other districts to elect a senator, whereas the residents of a single member district of one seventh the population of Fulton County did not: “ If the weight of the vote of any voter in a Fulton County district, when he votes for seven senators to represent him in the Georgia Senate, is not the exact equivalent of that of a resident in a single-member constituency, we cannot say that his vote is not ‘ approximately equal in weight to that of any other citizen in the State
Multiple member districting is at present provided for in several counties of this State in permanent reapportionment plans, recently adopted, and is clearly contemplated by subdivision 1 of section 8 of the Westchester County Charter (L. 1937, ch. 617, as amd.). Recently in Bianchi v. Griffing (256 F. Supp. 617) a three-Judge United States District Court in the Eastern District of New York, approved as constitutional, a modified weighted voting plan for Suffolk County, similar to that provided by the local law, and such laws are also in effect as permanent measures in some counties of the State.
Straight weighted voting (single member districts of unequal population, with the vote of each representative weighted in proportion to population) has travelled a much rougher road in this State. Although at times accepted, as a temporary, or stop-gap measure, it has been rejected almost as frequently as a permanent plan. A straight weighted voting plan did meet with both court and popular approval in St. Lawrence County, however, and laws providing for similar plans are now in effect in some counties.
In Graham v. Bd. of Supervisors, Erie County (18 N Y 2d 672, 674) the judgment at Special Term, (affd. 26 A D 2d 772) approved a local law providing for weighted voting as an interim plan, stating that as such a plan it was constitutional, but that it was disapproved as a permanent plan. The Court of Appeals, in modifying and affirming the judgment appealed from noted that weighted voting had inherent defects but approved the weighted voting plan embodied in the local law, “ but solely as a temporary expedient ’ ’.
*103 The affirmance does not mean, of course, that the Court of Appeals approved the statement at Special Term as to the constitutionality of the weighted voting plan even as a temporary measure. Neither does it mean, necessarily, that the Court of Appeals has determined that weighted voting plans are per se unconstitutional, regardless of their effect under any given state of facts. The determination in the Graham case should, for the present at least, be confined to its own facts which involved the weighting of votes with a range of from 54 to 1. (5.4 in the
Town of Tonawanda to .1 in the Town of Wales).
In the instant case which involves a system of multiple districting, for the purpose of breaking up the concentration of unduly large numbers of votes in the hands of individual legislators, and weighted voting to equalize legislative votes, with a range of only 7% to 1, the plan presents a picture considerably different from that disclosed in Graham. Plans which provide for reapportionment of county legislative bodies will necessarily deal with varying conditions in different counties. Each should be judged in the light of its own provisions as they deal with local conditions, and as they affect the citizen’s right to fair and effective representation in the legislative body. What may be impermissible with respect to State legislative reapportionment plans may be permissible in county plans, and what may be permissible in one county may be unacceptable in another (cf. Reynolds v. Sims, 377 U. S. 533, 578, supra-, Swann v. Adams, supra). The equal protection clauses do not require the application of rigid rules in all cases of legislative apportionment, if varying circumstances justify a departure from them, in particular cases, or classes of cases. There are obvious differences between State legislative bodies and county boards of supervisors which justify a different approach to county reapportionment problems, than that which has been approved, so far with respect to State plans. The composition of boards of supervisors has been provided for by State laws presumably for reasons which the Legislature considered sufficient, and while those laws may be superseded under home rule powers or charter provisions, there is no reason why a Board of Supervisors should not attempt to comply with them insofar as it may be possible to do so if that purpose can be effected without violation of the constitutional rights of the citizens of the county. The towns and the cities are political subdivisions of the county, and large or small, each has its problems which it does not share with neighboring towns, or cities, and in which its neighbors may have no interest whatsoever.
*104 The prohibition of the equal protection clauses goes no further than the invidious discrimination (cf. Williamson v. Lee Optical Co., 348 U. S. 483, 489, supra), and a legislative apportionment plan which seeks to preserve a separate voice in legislative processes, to the small, as well as the large communities if it can be effected without such discrimination, neither violates that prohibition, nor is it because of that purpose, irrational or unreasonable. If such a purpose can be effected only through the employment of weighted voting or multimember districting, a plan which employs either device, or both, should not be declared unconstitutional under the equal protection clauses because of defects which may appear in hypothetical situations not shown to be relevant, or because of inherent defects which do not produce in the particular case under consideration a constitutionally impermissible result. If it had been shown here that the asserted overweighting of the citizen’s vote, in the more populous constituencies, had resulted in a distortion of the legislative influence of their representatives, to the detriment of their neighbors in the less populous constituencies, disapproval of the law on that ground would have been required. In that respect, however, the local law effects no invidious discrimination. Each legislator will cast an effective vote in the board, proportionate to the population of his constituency and proportionately equal on a population basis to that of every other legislator and no citizen will be denied full and effective population-based representation through his elected representative or representatives. In the absence of controlling authority to the contrary, this court would not be inclined to require anything more, if the local law were otherwise acceptable.
Of course, as has been stated, if recent decisions of the Supreme Court and our Court of Appeals are to be interpreted as requiring nothing less than the election of equal numbers of representatives with equal voting powers, from districts of equal population to meet constitutional requirements, the local law must be disapproved in any event. There has been no indication so far however, of such a requirement, at the county level, at least. Neither has there been any determination in the multimember district cases which have reached the Supreme Court, or in .the Graham case {supra) that the equal protection clauses require the assignment of all the representatives of a multimember district to a legislative committee in which the district is represented, or that a legislator who casts a weighted vote in a legislative body must be permitted to cast a vote of the same weight in committee work. If there is such a constitutional requirement, the local law is vulnerable from that standpoint, *105 also. It is obviously not practicable to comply with such a requirement in the selection of committeemen, or in the actual work of the committees of the board, and apparently no party to this action contends-that it is. However, although all matters which come before the Board of -Supervisors are referred to committees for consideration and report, no proof has been produced that legislative determinations are made in committee, or are governed by the majority reports of such committees, or that any difficulty exists in bringing a measure out of committee for full discussion and action by the entire legislative body. In the absence of evidence to the contrary, it appears to be a reasonable conclusion that the weight of a legislator’s vote will be given adequate consideration in committee work, and that if it is not he will make it felt when the committee report is submitted to the board for action. It appears to be a reasonable conclusion also that in other activities, such as debating on the floor, consultation with other branches of the government, and the like, adequate consideration will also be given to the legislator’s potential influence on legislative decisions. All legislators cannot serve on all committees, and the work of some will involve more important matters than the work of others. No matter what the plan of legislative apportionment may be, no citizen can be assured that his representative will serve on one committee, or another, or as a practical matter that his voting power in committee will be proportionate to his voting power in the legislative body as a whole. Nevertheless, the argument that the local law is invalid because the apportionment of voting power which it provides is unfitted for the work of legislative committees, is not unreasonable, or entirely lacking in merit. The question is not free from doubt, but in the absence -of evidence which has not been produced in this case, and of controlling authority, it is the court’s opinion that the local law should not be disapproved, because it does not provide for population-based representation of the citizens of the county in legislative committees, or in activities of the legislators other than the discharge of their duties at the meetings of the board.
Other arguments advanced in opposition to the local law require little discussion. The claim that the local law discriminates against the villages by designating the Town Supervisors as county legislators, and by failing to provide for representation of the villages on the board raises no substantial constitutional question. Whether the residents -of the territory within the villages are to be represented on the board by the Town Supervisor or some other town or village officer, or by a legislator elected at large from a town or a district embracing a town, *106 must be decided by the board under the powers granted by the Constitution and the Municipal Home Buie Law, and in the absence of preventive limitation or restriction of those powers by the Constitution or relevant statutory law, the board, and not the courts, must make the necessary decision. Neither does the fact that a town may have a conflict of interest with the county, under some circumstances, require a determination that the choice of the supervisor is not permissible. No matter how he might be selected, any representative would have the interests of his constituents in mind in situations in which their interests might be involved, and even if it be assumed that a representative other than a Town Supervisor would be preferable, the question would, nevertheless be one involving legislative, and not judicial discretion. In any event, it is difficult to understand how any party to this action will be prejudiced by the selection made. It is a fundamental principle of law that the constitutionality of a statute may be attacked only by one whose rights have been affected by the operation of the law and constitutionality of an act will not be considered on the application of a litigant unless he shows that he comes within the scope of the act and that it may cause him injury. (Kipp v. Village of Ardsley, 13 A D 2d 1012, 1013.)
Neither may the contention he sustained that the law is invalid because of its requirement that the additional legislators to be elected in the towns must be property owners and no such requirement is found in the city charters. There are several answers to this objection. Neither our own Constitution nor the equal protection clause of the Fourteenth Amendment prohibits the exercise of a wide legislative discretion in the determination of the extent to which laws shall apply to different classes of persons, or in the classification of .the persons whom the laws may affect. The classification must rest on some reasonable basis, but if it is called into question, if any state of facts can be reasonably conceived that will sustain it, the existence of that state of facts must be assumed. Here the Board of Supervisors may have had in mind the fact that all the members of the board, with .the exception of the additional legislators, would be town or city officers, that such an officer would have an interest in the welfare of his community by virtue of his office alone, and that a legislator from a town, if a property owner, might be expected to have a comparable interest. Since a classification on such a basis could hardly be considered arbitrary (See Town Law, § 23, Matter of Becraft v. Strobel, 158 Misc. 844, 850, affd. 248 App. Div. 810, affd. 274 N. Y. 577), and the law is applicable alike to all who are members of the same class (the additional *107 legislators) there is no basis for the contention that there has been a denial of equal protection of the laws. (Cf. Sweeney v. Cannon, 23 A D 2d 1; Derman v. Ingraham, 47 Misc 2d 346, affd. 25 AD 2d 795.)
If it be assumed, however, that this provision of the local law is invalid, it may be readily exscinded, without doing violence to the legislative intent (cf. People v. Mancuso, 255 N. Y. 463, 473, 474), and whether it is invalid or not it does not appear on the present record that any party, or any citizen has been subjected to any discrimination by the restriction complained of.
It must be conceded, because of the lack of definitive standards which may be applied in the application of the “ one person, one vote ” rule to the apportionment of seats or voting power in local legislative bodies, that some doubt would exist as to the validity of the local law even if the apportionment had been made on a proper population basis throughout the county. However, it is the court’s opinion that, except with respect to the invalidity of the population base, unconstitutionality has not been sufficiently demonstrated (cf. Wiggins v. Town of Somers, 4 N Y 2d 215, supra). It would be a more satisfactory course to permit the people of the county .to express their choice, for or against the law, even though no alternative plan would be submitted for their approval. However, even popular approval could not overcome constitutional invalidity (cf. Lucas v. Colorado Gen. Assembly, 377 U. S. 713), and no useful purpose could be served by permitting the referendum to proceed. The motion for approval of the law is accordingly denied.
It has been conceded that no evidence is available, except that submitted, as to the populations of the wards in the City of Yonkers. That evidence is not sufficient to permit a finding by the court that the population of any ward has been established. Perhaps the gupervisors, on the basis of the present evidence and such other evidence as they may discover in the exercise of their legislative authority, can come to a rational conclusion as to such populations, and can present a proper plan, based on their findings. At least .they should have an opportunity to do so if they wish to, or to formulate a proper district plan, providing for electoral districts of equal population. Whatever is to be done however, should be done without delay so that some plan may be promptly submitted to the people for approval.
No further action by the court is considered necessary at this time, particularly in view of the fact that there are at present at least six appeals pending, in which questions presented on this motion may be decided by appellate courts. A judgment may be submitted on notice, denying .the motion for approval of *108 the local law, declaring it unconstitutional, and providing that the court will retain jurisdiction of the action with leave to any party to apply for further relief on or after a date to be fixed therein.

*109